THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JIMMY LEE GIBSON, Defendant-Appellant.

First District (5th Division)   No. 1—87—3728

Opinion filed October 19, 1990.—Rehearing denied November 18, 1990.

362

Randolph N. Stone, Public Defender, of Chicago (Timothy J. Leeming and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, David Butzen, and Larry Manassa, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

This appeal is taken from a judgment entered upon a verdict finding the defendant guilty of aggravated criminal sexual assault by use of a dangerous weapon and armed robbery. The defendant was sentenced to 12 years' imprisonment.

It is undisputed that the complaining witness, L.T., was the victim of a rape and robbery on October 26, 1986. The only issues before us concern the identity of the person who committed the crimes. For the reasons expressed herein, we affirm.

The record reflects that on October 26, 1986, at about 4 p.m., the victim, while walking on Central Avenue in Chicago, realized that she was being followed. To confirm this fact she turned toward the person following her, who at this moment was five steps behind her, saw him, and observed that when she slowed down he slowed down. When she sped up, he sped up. She did this twice. Realizing that she was being followed, the victim was about to make a break to get away, when she was grabbed from behind by her left arm. The assailant stood at the victim's left side, stuck a gun into her side, and told her that if she screamed he would shoot her. It was at that moment that the victim looked at his face for the second time. She also testified that it was daylight throughout the approximately 45 minutes that she was his captive.

The assailant, with his gun to the victim's side, asked her for her money. She advised him that she had none, but that she was wearing a gold chain. He forced the victim to continue to walk, all the while having one arm around her neck and holding his gun into her left side, until they reached a vacant lot. It was during this march that the victim saw her assailant's face for the third time. As they walked, he also took the victim's gold chain.

The victim was then told to disrobe, including her shoes. The assailant ordered her to lie on the ground, on her stomach, and then

proceeded to rape her from behind. Throughout the entire sexual act, the assailant held the gun in his hand. Upon completing his crime he again told the victim that if she looked at him, he would shoot. He then scattered the victim's clothing and left the scene.

The victim testified that following the rape she noted that the sun was just beginning to set. She looked for her clothing and found all but her shoes and jacket. Disheveled and upset, she left the scene to look for help.

Adrienne Ward, a neighbor, testified that on the day in question she was standing in front of her house at 729 North Pine Avenue, at about 5 p.m., when she heard someone crying. She saw the victim, whom she had never met before. The victim told the witness that she had just been raped. Ward noted that the victim was shoeless and that her pants were hanging off and were dirty, as was her blouse. Ward stated that the victim was wet, was not wearing her jacket, and was crying. She looked "bad" and "hurt." Ward then invited the victim into her home in order that she might call the police. Emma O'Neal, the sister of Adrienne Ward, was in the residence at the time that the victim entered. The victim told O'Neal that she had been raped and that the rapist had a gun.

O'Neal called the police. Officer Richard Banaszkiewicz responded to the call and arrived at the O'Neal residence at about 5:29 p.m. The victim took the police officer to the scene of the crime, where he recovered the victim's shoes. In touring the scene of the crime, he noted that the area pointed out by the victim as the place where the rape occurred had been matted down. The police officer then took the victim to St. Anne's Hospital.

The victim, while at St. Anne's Hospital, was interviewed by Detective Edward Strandberg and his partner, Detective Robert Collins, who were added to the investigation team. Detective Strandberg testified that the victim told him at the hospital that she wanted to view police photos of suspected offenders right away. Detective Strandberg further testified that following her examination and treatment, the victim was taken to Area 5 Headquarters, where she slowly and carefully looked through six separate books of sex offenders and robbery suspects. She appeared to be looking at each photo. The victim did not find defendant's picture in these books.

The record reveals that it was stipulated by the parties that a Vitullo Kit was obtained from the victim by a serologist employed by the City of Chicago Police Crime Laboratory, and that spermatoza were found to be present.

The victim's testimony that she reported the crime, and that she

visited the rape scene with the officer, was corroborated by Adrienne Ward, Emma O'Neal, and Officer Banaszkiewicz.

The evidence next revealed that on November 18, 1986, the victim, while shopping in a neighborhood grocery store, by chance came face to face with her assailant. She immediately notified police officer Rocco Colucci, who was on foot patrol at the time in the store next door. The victim testified that she told Officer Colucci that she was positive that defendant was the man who had raped and robbed her, and that she was too upset to go back into the store. She waited outside while the officer arrested the defendant. When Officer Colucci brought the defendant out of the store, the victim again positively identified him as the man who had raped her. Officer Colucci corroborated her testimony as to these facts.

In addition, the victim made a positive in-court identification of the defendant as her rapist. She had told the police during the investigation, and also testified at trial, that at the time of the rape, the man who attacked her was wearing a "Jheri Curl" hairstyle. She had also told police that the rapist was in his late 20's and weighed about 140 pounds and was not wearing a headband or jogging pants.

Defendant Gibson took the stand on his own behalf. According to defendant, he was with friends and his cousin, Charles Cannon, from 9:30 a.m. to approximately 6 p.m. on the day that the victim was assaulted. He further testified that he had never seen the victim before he saw her at the grocery store on the day of his arrest. Defendant stated that although he had worn "Jheri Curls" at one time, he could no longer afford to keep the hairstyle, and had stopped wearing it. He also testified that he did not quit wearing the hairstyle on or about October 26, 1986. Defendant went on to testify that on the morning of October 26, 1986, he went jogging with a friend, Robert Gant. He wore a jogging suit and shoes, as well as a headband, at the time. They finished jogging at about 11 a.m. and went back to Gant's residence. Shortly thereafter, defendant went to his cousin's house, arriving at about 12 noon. Defendant, his cousin, and his friends, Gant and Charles Williams, watched a professional football game on television until half-time, when defendant, Gant, and Williams went to a liquor store. After purchasing some beer, defendant returned to Cannon's house and remained with his cousin until about 6 p.m. He noted that it was dark outside at that time. His friends then drove him to his grandfather's house.

Defendant further testified that on October 26, 1986, he weighed 180 pounds and that on the date of the trial he was 30 years old and weighed 186 pounds. He further testified that on October 26, 1986, he

wore a mustache, but no "Jheri Curls," although his hair was a little longer than at the time of the trial. He stated that the grocery store where he was arrested was located about two to three blocks from his cousin's home. He also admitted, on direct examination, that he had been convicted of theft in 1981 and sentenced to probation.

Defendant's sole alibi witness, Charles Cannon, corroborated defendant's version of his activities from 12:30 p.m., when defendant arrived at his cousin's home to watch a football game, as Cannon claimed he did every Sunday, until about 7 p.m., when defendant left with his two friends. Cannon further testified that on October 26, 1986, the defendant was perspiring when he arrived because he had been jogging. Cannon was certain that on that date defendant was wearing a straight hairstyle. Cannon stated that he had never seen defendant in "Jheri Curls."

On cross-examination, when shown a photograph of defendant taken in 1985 by the Chicago police, approximately 17 months before the crime, in "Jheri Curls," Cannon admitted that it was a photograph of the defendant. He admitted having known defendant since childhood.

The photograph taken of defendant in May 1985, which appears in the record and clearly shows him with a mustache and "Jheri Curls," and the police photograph taken on the day after his arrest, were admitted into evidence. It is noted that the photograph taken of defendant on November 19, 1986, was admitted into evidence without objection. There was an objection made, however, to the admission of the photograph of defendant taken in 1985, with defendant arguing that it was too remote, and that because it was a police photograph, it suggested that defendant was implicated in yet another crime. The date and police identification were accordingly removed from the photograph by the trial judge after a conference with counsel outside the presence of the jury. It is further noted that no limiting instructions were requested by defendant and therefore any argument pertaining to a limiting instruction is deemed to be waived.

Officer Colucci testified that at the time of the arrest, defendant weighed about 130 to 140 pounds. He could not remember if defendant wore "Jheri Curls" at the time, but he thought not. When confronted on cross-examination with the written arrest report, Colucci acknowledged that it said that the defendant weighed 180 pounds and that it had been signed by him, although he also testified that he did not write the "180" in the box. It was his testimony that defendant appeared to be approximately the same weight when arrested as he was in the courtroom. On redirect examination a supplemental police

arrest report was shown to Officer Colucci, who testified that he had actually written as well as signed this report. He stated that he had written "130" in the box from his own observations, although on the day of the trial, he was of the opinion that defendant looked like he weighed 145 or 150 pounds.

OPINION

Defendant contends that his conviction must be reversed because the identification testimony of the victim was not sufficient to establish his guilt beyond a reasonable doubt. It is the defendant's position that the victim had little opportunity to observe her assailant's appearance and that the characteristics she did report did not match his. He also maintains that the trial judge's admission into evidence of the year-old photo showing him wearing a "Jheri Curl" was an abuse of discretion which prejudiced him, as it was too remote from the crime, and also implicated that he was involved in still another, third crime because it was a cut-down police photo. Ostensibly this photo was admitted to impeach his alibi witness' testimony, but it was considered by the jury along with all other evidence and without limiting instructions, which we know were never asked for at trial. He asks that we either reverse or remand for a new trial.

The State, of course, has the burden of proving beyond a reasonable doubt that a crime occurred and that the accused is the person who committed it, but the latter burden may be met by offering a positive identification by a single witness who had an adequate opportunity to observe the offender, even if the circumstances of the observation were less than perfect. It is the jury's province to determine whether the State has met this burden; therefore, the resolution of factual disputes and the assessment and credibility of the witnesses are for the jurors, and we will not substitute our judgment for theirs unless the evidence itself is so improbable as to raise a reasonable doubt of defendant's guilt. *People v. Jones* (1983), 114 Ill. App. 3d 576, 587, 449 N.E.2d 547, 556.

The defendant, however, points our attention to the case of *People v. Reese* (1973), 14 Ill. App. 3d 1049, 303 N.E.2d 814, a case from this division, which he urges upon us as supportive of his position. We believe that defendant's reliance upon *Reese* is misplaced, as *Reese* is clearly distinguishable from the case at bar. We of course agree that, in rape prosecutions, it is the rule that although the testimony of the complaining witness is uncorroborated by other witnesses, it is sufficient to justify conviction if her testimony is clear and convincing. (*Reese*, 14 Ill. App. 3d at 1053-54, 303 N.E.2d at 818.)

Our court in *Reese* went on to hold that where the victim's testimony is not of such clear and convincing character, as we felt it was not in *Reese*, and defendant denies the charge as he did there, her testimony should be corroborated by other facts or evidence in the case. We find that in the case at bar, the victim's testimony was clear and convincing. She saw her assailant when he was five feet away and saw him a total of three times during the 45-minute encounter. In addition, the police officers and other witnesses who testified corroborated her version of the story in recounting their investigative process. Whereas in *Reese* we found no corroborative evidence of the victim's making a prompt complaint, the victim in the case at bar made a prompt complaint and immediately put into motion an investigative process by trying to identify the assailant from photographs. The victim also stated that it was daylight at the time that she was stopped by her assailant and that after the crime had been committed the sun was just setting.

We further distinguish *Reese* from the instant case by observing that in *Reese*, the physical description which the victim gave to the officers was not only not corroborated by the police arrest report describing his height, weight, and age, but in fact the police report was more corroborative of the testimony which the defendant gave from the witness stand. This is not true in the case at bar. Further, the *Reese* court held that the testimony of the complaining witness lacked the necessary attributes of being clear and convincing, as her testimony about the day of the crime had to be weighed against that of an unimpeached alibi witness, which likewise is not true in this case. Finally, in *Reese* there was no one to corroborate the victim's testimony as to what she did after the rape, including the reporting process. The court in *Reese* therefore concluded that where the evidence of guilt was doubtful and uncertain, as they believed it to be, and that the explanation by defendant was positive and unimpeached, as they declared it to be, then it became the court's duty to reverse the conviction. Such is not the case here.

■ The defendant next directs our attention to the case of *People v. Nellons* (1984), 130 Ill. App. 3d 908, 475 N.E.2d 208, also an opinion of this division. Following a bench trial, Nellons was convicted of rape and sentenced to eight years in prison. The judge heard the testimony, including the testimony of defendant's several strong alibi witnesses. The trial judge specifically stated that he believed the alibi witnesses to be credible, although mistaken, but nonetheless found the defendant guilty. It should be noted that, in the case at bar, we have but one alibi witness and his credibility was dealt with by the jury. In

*Nellons* this court held that the identification of the defendant as the assailant was not only negated by the unimpeached alibi testimony, but was also weakened by a number of other factors. We held in *Nellons*, after examining the entire record, that there was reasonable doubt as to defendant's guilt. We do not find that a reasonable doubt exists in the instant case.

We therefore believe that both *Reese* and *Nellons* are readily distinguishable from the case at bar. In the instant case, both victim and defendant had the opportunity to testify at the trial, along with the arresting officer who saw the defendant three weeks after the crime. Defendant presented only one alibi witness, and the jury had the opportunity to observe him and to weigh his credibility along with his testimony. The victim, during the 45-minute ordeal, with heightened attention in daylight, had the opportunity to clearly view defendant's face three times. She was very positive about her identification, both at the arrest scene and at trial. Her other physical descriptions of defendant were somewhat corroborated by the police officer. The jury had the opportunity to view defendant at the trial and had the opportunity to examine a photo of defendant taken 17 months before the crime, and a photo of him taken three weeks after the crime. It was based on this evidence, as well as the testimony of several unimpeached State's witnesses, that the jurors found the defendant guilty. It is our view that the jury did not reach a conclusion that was so improbable as to raise a reasonable doubt as to defendant's guilt.

The second issue to be addressed is defendant's allegation that the trial court committed reversible error in admitting the police photograph taken in May 1985. He contends not only that it was too remote in time, but more particularly, since it was a cut-down version of a police photograph, that it would suggest to a knowledgeable jury that the defendant was implicated in yet another, third crime.

The standard by which we must judge this issue is set forth in *People v. Jones* (1983), 114 Ill. App. 3d 576, 449 N.E.2d 547, an opinion of this division. Ordinarily, it is within the discretion of the trial court whether or not to admit a photograph into evidence. The court's decision must be based on a consideration of the photograph's probative value as opposed to its prejudicial effect, and a determination of whether it portrays facts relevant to an issue and can be verified as a correct representation of those facts. On appeal, its decision will not be reversed absent a showing of an abuse of that discretion and of resulting prejudice to the defendant. *Jones*, 114 Ill. App. 3d at 590, 449 N.E.2d at 558.

These principles were applied in *People v. Hayes* (1973), 14

Ill. App. 3d 248, 302 N.E.2d 411. In *Hayes*, State's exhibit No. 1 was a police photograph of the defendant taken approximately one month prior to the crime. It was introduced for the purpose of impeaching defendant's own testimony that he had always worn a natural hair style. To this extent the facts in *Hayes* parallel those of the case at bar. The photograph of Gibson was taken prior to the attack and was introduced for the purpose of impeaching the defendant's cousin's testimony that he had never seen Gibson in "Jheri Curls." The defendant in *Hayes* identified the photograph and testified that the photograph showed a hat ring in his hair, which made his hair look closer to his head in one spot. In *Hayes*, the record revealed that prior to admitting the photograph into evidence, the trial judge held a hearing outside the presence of the jury, where the issue of admissibility of the photograph was fully discussed. One of the three police photographs was then removed, and the other two, cut down to remove the police identification number and chain, were allowed into evidence. Gibson's picture was also cut down to remove police identification. In *Hayes*, this court concluded that the photograph was material to the issue of defendant's hair style, which was an element of the identification testimony of the victim. The same holds true in the instant case. In *Hayes*, this court held that the issue of whether to admit the photograph into evidence lay within the discretion of the trial court, that the trial court had properly exercised its judgment in admitting the photograph, and that the decision was not prejudicial error. We likewise hold that the trial judge's decision did not constitute an abuse of discretion under the facts of this case.

Accordingly, for the reasons stated, defendant's convictions are affirmed.

Affirmed.

LORENZ and MURRAY, JJ., concur.