THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CEDRIC PETERSON *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 1—93—0324, 1—93—1468 cons.

Opinion filed June 30, 1995.—Rehearing denied July 31, 1995.

DiVITO, J., concurring in part and dissenting in part.
McCORMICK, J., concurring in part and dissenting in part.

Charles Schiedel and Charles Hoffman, both of State Appellate Defender's Office, of Chicago, for appellant Cedric Peterson.

Rita A. Fry, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant William Castile.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

This case arose out of a shooting incident on June 6, 1992, in which a bystander, 68-year-old Reverend Daniel Vinson, was wounded. Defendants Cedric Peterson and William Castile were subsequently indicted on charges of armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992))); attempted first degree murder (Ill. Rev. Stat. 1991, ch. 38, pars. 8—4, 9—1 (now 720 ILCS 5/8—4, 5/9—1 (West 1992))); aggravated battery of a senior citizen (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.6(a) (now 720 ILCS 5/12—4.6(a) (West 1992))); aggravated battery with a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.2 (now 720 ILCS 5/12—4.2 (West 1992))); and aggravated discharge of a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 24—1.2(a)(2) (now 720 ILCS 5/24—1.2(a)(2) (West 1992))). Defendants were tried in a joint bench trial.

Reverend Vinson testified that on June 6, 1992, he was director of the Outreach Mission Christian Center in the City of Chicago and that he managed the Outreach Mission Car Wash at 3519 West Madison Street. At about 1:30 p.m. on that day, he was seated in front of the car wash with Dorothy Harris, a bookkeeper, and Peterson, whom Reverend Vinson knew from the neighborhood.

While Reverend Vinson and Harris were doing book work, Peterson approached Castile on the street and told him to get out of his territory. Castile, whom Reverend Vinson also knew, responded by saying, "Get out of my face. I'll blow you away." Peterson opened his coat and stated, "Blow me away. I don't have anything." As Peterson started to walk back to the car wash, he suddenly turned around, fell to one knee, and drew a gun. Peterson and Castile then began shoot-

ing at each other. At this time, Peterson was about five feet away from Reverend Vinson and Castile was about 10 feet away. Reverend Vinson heard six or eight shots fired in quick succession, and saw both Peterson and Castile fire their guns, although he could not tell who fired first. As they fired, Castile chased Peterson through the car wash and "everybody went to run."

At that time, Reverend Vinson realized that he had been shot. He flagged down a car and had the driver take him to the hospital where he was treated for a bullet wound in his right elbow. No bullet was removed from his arm, but he spent six hours in the hospital where he was given a tetanus shot, but no stitches, because the doctor hoped to prevent an infection by allowing the wound to drain. Reverend Vinson has a one-half- to one-inch scar on his elbow as a result of the wound.

On cross-examination, Reverend Vinson stated that the "first thing I heard that immediately got my attention" was Castile's comment that he would blow away Peterson. He recalled that Peterson was facing away from him during the first several shots, but that he was running through the car wash when Reverend Vinson first noticed blood on his elbow.

Also on cross-examination, Reverend Vinson contradicted his earlier testimony by recalling that Peterson fired the first shot and that Castile hid behind a box situated in front of the car wash and fired back. However, on redirect examination, Reverend Vinson reiterated that he was unsure who fired the first shot.

At the time of the shooting, Officer Tony DiCristofano was making a traffic stop at 45 South Homan, around the corner from the car wash. He heard several shots coming from the alley behind Madison and observed Castile chasing Peterson through the alley. When he ordered Castile to drop his gun, he complied. Officer DiCristofano observed that there were four spent cartridges and one live cartridge in the gun. A few minutes later, Peterson was arrested. Peterson initially denied having a gun, but then told the police that he had hidden it in an air vent at a Chicago Housing Authority (CHA) building. The officers found the gun, and Officer DiCristofano noticed that it had one spent cartridge and four live cartridges in its cylinder. Both Peterson and Castile admitted shooting at each other, but denied intending to shoot Reverend Vinson.

Peterson gave a statement which was published without objection and was admitted into evidence against only him. In it, he stated that about three weeks earlier he had lost $150 in a dice game and that he borrowed the money from Castile. On the day of the shooting, he paid Castile $160 after Castile asked for repayment of the loan plus $10. Peterson then retrieved a gun from the car wash where he

had hidden it and placed it in his waistband. As Castile and some others were walking towards the car wash, Peterson told Castile to stop threatening him. Castile responded that they should stop arguing and shake hands before they killed each other. After they shook hands, Castile pulled out his gun and shot at Peterson. Peterson simultaneously pulled a gun and fired at Castile. Castile fired three or four times and Peterson fired three times. Peterson ran into the car wash as they fired at each other, and Castile followed him. Peterson knew that other people, including Reverend Vinson, were at the car wash while he and Castile were shooting. Peterson further stated that he ran through the car wash and hid his gun in a vent in the laundry room of a CHA building and then left the building. The police spotted him and eventually arrested him.

Castile also made a statement after he had been treated for a bullet wound to his knee. The statement was admitted into evidence against only Castile and was published without objection. According to Castile, in the afternoon of June 6, 1992, he was in Garfield Park across from the car wash when his friend, Peterson, approached him. He asked Peterson to repay him the $160 that he had lent him. Castile said that they argued over the money. At one point, Peterson reached under his clothes as if he were reaching for a gun and told Castile to stop "messing" with him.

Peterson then walked across the street to the car wash. Shortly afterwards, Castile began to walk to the tavern next to the car wash and Peterson called out to him, asking why he was still "messing" with him. Castile said that they should stop fighting and shake hands before they hurt each other. They then shook hands and Castile began to walk towards the tavern. At that point, Peterson jumped up and pulled out a handgun. Castile ran behind a box and pulled out his gun. Peterson fired three shots, one of which hit Castile. Castile fired two shots. Castile was aware that other people were at the car wash during the shooting, including Reverend Vinson. Peterson fled into the car wash and shot from there. Castile followed him and was arrested as he exited from the back of the car wash.

After the State rested, both defendants moved for a "directed" finding (despite the fact that they were tried in a bench trial). The court granted the motion only on the attempted first degree murder charge, denying it as to all other charges. The judge did not elucidate the basis for his ruling.

Peterson testified that he knew Castile for about 9 or 10 years prior to June 1992. He stated that Castile had a reputation as a killer and a threatening and dangerous person. Counsel for Castile objected to this testimony, but the trial court overruled his objec-

tions. Peterson went on to testify, over Castile's counsel's objection, that Castile had shot him in 1991. Castile's counsel then moved for a severance, stating, "I was not aware this was going to happen." The trial court denied his motion, noting that he would have an opportunity to cross-examine Peterson.

Peterson testified further that when Castile approached him in the park and asked for the $160, he motioned, revealing a gun in his jacket, and Peterson interpreted this gesture as a threat. He got the money and paid Castile. He then got his gun from the car wash because he was fearful that Castile would start shooting. When he and Castile shook hands in front of the car wash, they "said a couple more words to one another" and Castile then threatened to blow him away. Peterson recalled that they pulled their guns simultaneously and that he drew his gun because he was scared. Castile fired first and he returned fire only once. When he fired, he was facing Castile, not Reverend Vinson. Peterson ran away when he saw a police car coming.

On cross-examination by the State, Peterson acknowledged that even though he believed that Castile was a threatening person, he borrowed money from him. He also admitted that he did not tell the police that Castile shot him in 1991 and that he did not go home, leave the area, or contact the police when Castile threatened him on June 6, 1992.

When cross-examined by Castile's counsel, Peterson denied that Castile had lent him money on other occasions or that he helped him get bond money when he was charged with first degree murder in a different case. Peterson said that before the shooting, he put his gun in the front of his belt and denied that he opened his coat to show Castile he had no weapon.

After Peterson rested, the State and Castile entered a stipulation that Castile was treated for a through-and-through gunshot wound to the left knee in the afternoon of June 6, 1992. Castile then rested.

The judge found both defendants guilty of aggravated discharge of a firearm, aggravated battery with a firearm, armed violence, and aggravated battery of a senior citizen. He also found that self-defense was not applicable because "[i]t was in fact a mutual combat situation."[1]

Both defendants filed motions for a new trial, but the judge denied

---

[1]Peterson notes that "mutual combat" is a fight or sudden quarrel in which two parties willingly engage and mutually fight on equal terms with death resulting from the combat. (*People v. Austin* (1989), 133 Ill. 2d 118, 125, 549 N.E.2d 331, 334.) The judge apparently did not refer to "mutual

them. The judge stated that each defendant performed conscious and deliberate acts which caused Reverend Vinson's injury. He went on to note that while it would never be known whose bullet injured Reverend Vinson, each defendant was equally responsible for the injury.

The judge sentenced Castile to nine years in the custody of the Illinois Department of Corrections for aggravated battery with a firearm and seven years for aggravated battery of a senior citizen and aggravated discharge of a firearm, the sentences to run concurrently. He sentenced Peterson to concurrent sentences of eight years for aggravated battery with a firearm and seven years for aggravated discharge of a firearm and aggravated battery of a senior citizen. Defendants' armed violence convictions merged. They now appeal.

■ The State correctly agrees with defendants that their convictions for aggravated battery of a senior citizen must be vacated under the one-act-one-crime rule. We therefore find that analysis of issues relating to those charges is unnecessary. See *People v. Tayborn* (1993), 254 Ill. App. 3d 381, 391, 627 N.E.2d 8, 15; *People v. Robinson* (1993), 250 Ill. App. 3d 824, 829, 619 N.E.2d 1359, 1364.

Peterson first contends that since the "overwhelming evidence" indicated that Castile shot Vinson, his conviction was based on accountability. He reasons from this proposition that his convictions must be reversed because he never intended to aid or abet Castile in the commission of a crime. In fact, he and Castile acted as adversaries when they shot at each other. The State counters that Castile and Peterson are equally responsible for shooting Reverend Vinson because they engaged in a course of criminal conduct the foreseeable result of which would be the wounding of a bystander.

Contrary to Peterson's assertion, the evidence is not clear that Castile shot Reverend Vinson. When the shooting began, Peterson's back was to Reverend Vinson, who was sitting near the entrance to the car wash. At some point, however, Peterson turned around to run through the car wash. Peterson indicated in his statement that he and Castile fired at each other as they ran into the car wash. Reverend Vinson testified to the same effect. Thus, Peterson conceivably could have shot Reverend Vinson when he turned to enter the car wash. Since the bullet which hit Reverend Vinson was not found, the judge's finding that it was unknown who actually hit Reverend Vinson was reasonable. See *People v. Banks* (1994), 260 Ill. App. 3d 464, 469, 632 N.E.2d 257, 261 (reiterating the familiar principle that

combat" as a term of art; rather, he was describing the sudden, voluntary nature of defendants' shooting.

the trier of fact determines the credibility of witnesses, the weight to give their testimony, and reasonable inferences to be drawn therefrom).

Peterson contends that he could not possibly have shot Reverend Vinson because he shot Castile in the leg and Officer DiCristofano found only one spent cartridge in his gun. However, the evidence on this point was conflicting. In Peterson's statement, he admitted that he shot three times during the incident. These conflicts in the testimony were for the trial judge, not this court, to resolve. See *Banks*, 260 Ill. App. 3d at 469, 632 N.E.2d at 261.

Nonetheless, Peterson convincingly argues—at least as to his aggravated battery with a firearm—that there is insufficient evidence to sustain that conviction. Although Castile does not make this argument on appeal, he argued in the trial court and in his post-trial motion that his guilt was not proven beyond a reasonable doubt. We therefore consider the sufficiency of the evidence as to each defendant. See *People v. Lopez* (1993), 242 Ill. App. 3d 160, 162, 610 N.E.2d 189, 191 (although waived, sufficiency of the evidence issues can be considered on review as an exception to the waiver rule); see also *People v. Starnes* (1980), 88 Ill. App. 3d 1141, 1143, 411 N.E.2d 125, 127.

Our supreme court has instructed that

> "[t]he due process clause of the fourteenth amendment [citation] protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged. [Citation.] When presented with a challenge to the sufficiency of the evidence, it is [the reviewing] court's function to carefully examine the evidence, giving due consideration to the fact that the court *** saw and heard the witnesses. If, after such consideration, [the] court is of the opinion that the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged, then the conviction must be reversed. [Citations.]" (*People v. Young* (1989), 128 Ill. 2d 1, 48, 538 N.E.2d 461, 472.)

On review of a sufficiency of the evidence issue, the appellate court must view all of the evidence in the light most favorable to the prosecution. The relevant inquiry is whether any rational trier of fact could have found that the State established every material element of the crime beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77.

Accountability was not argued at trial by the State nor was it mentioned by the judge when he convicted defendants. Undoubtedly,

the State was cognizant that accountability requires a showing that the offender intended to promote or facilitate the commission of a crime, and that such intent is usually proven by showing that the accomplice shared a community of purpose or common design with the principal. (See *People v. Hodge* (1993), 250 Ill. App. 3d 736, 744, 620 N.E.2d 651, 658, *appeal denied* (1994), 154 Ill. 2d 564, 631 N.E.2d 713; see also Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c) (now 720 ILCS 5/5—2(c) (West 1992)) (one is accountable when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense").) The principal attribute of accountability is the showing of affirmative conduct by an accomplice that in some way aids, encourages or incites another to commit a crime. (1 J. Decker, Illinois Criminal Law § 3.06, at 3—10 (2d ed. 1993).) We have found no case where, as in the case at bar, defendants who acted at cross purposes, spontaneously shooting at each other, were held accountable for each other's conduct.

The State argues on appeal that defendants define accountability too narrowly and that the supreme court in *People v. Stanciel* (1992), 153 Ill. 2d 218, 606 N.E.2d 1201, found that accountability was applicable even though there was no common criminal design. In *Stanciel*, two mothers were convicted of murdering their children based on an accountability theory when their boyfriends' abuse of the children resulted in their deaths. In each case, the mother entrusted the care of her child to her boyfriend despite knowledge of his abusive behavior. The defendants argued that the State was required to show that they had the specific intent to promote or facilitate the crime. However, the supreme court held that "[a]ccountability, tied as it is to the crime charged, must comport with the requirements of that crime" and that the State was therefore required to show that each defendant possessed the requisite general intent for the crime of murder. (*Stanciel*, 153 Ill. 2d at 234, 606 N.E.2d at 1210.) The court went on to hold that the defendants' shared intent could be demonstrated through evidence of a common criminal design. Contrary to the State's representation of the opinion, however, the court expressly concluded that each defendant shared a common criminal design with the principal, as evidenced by each woman's allowing her boyfriend to care for her child despite knowledge of the abuse. *Stanciel*, 153 Ill. 2d at 235, 606 N.E.2d at 1210-11.

In the present case, there is no evidence that either defendant aided and abetted the other in furtherance of a common criminal design. The judge agreed with the State that both defendants could be convicted on the battery charges based upon the proof that one of

them must have shot Reverend Vinson. This reasoning overlooks the State's burden to prove each element of the offense beyond a reasonable doubt. (See *People v. Gibson* (1990), 205 Ill. App. 3d 361, 562 N.E.2d 1142.) The elements of aggravated battery with a firearm are found in the statute defining the offense, which provides that "[a]ny person who, in committing a battery, knowingly causes any injury to another by means of the discharging of a firearm, commits aggravated battery with a firearm." (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.2(a) (now 720 ILCS 5/12—4.2(a) (West 1992)).) A battery occurs when a person "intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." (Ill. Rev. Stat. 1991, ch. 38, par. 12—3 (now 720 ILCS 5/12—3 (West 1992)).) The indictment charges each defendant with "knowingly caus[ing] injury and bodily harm to Daniel Vinson by shooting him about the body with a gun."

Although the State merely alludes to the doctrine of transferred intent, we have considered whether it is applicable in the instant case and we hold that it is not. Under that doctrine, "[w]here someone in the commission of a wrongful act commits another wrong not intended, or where in the execution of an intent to do wrong, an unintended act resulting in a wrong ensued as a natural and probable consequence, the one acting with a wrongful intent is responsible for the unintended wrong." (*People v. Psichalinos* (1992), 229 Ill. App. 3d 1058, 1067, 594 N.E.2d 1374, 1381.) We attribute the State's cursory treatment of transferred intent to an implicit recognition of the fact that because we cannot ascertain which defendant committed the unintended wrong, we cannot apply the doctrine to hold both guilty. Compare *Psichalinos*, 229 Ill. App. 3d at 1067-68, 594 N.E.2d at 1381 (holding that when the defendant attempted to strike his intended victim, but actually struck his child, the requisite intent was transferred to the child and he was appropriately found guilty of aggravated battery of a child).

Since we have held that accountability and transferred intent are inapplicable in the case at bar, we are compelled to hold also that there is a reasonable doubt as to each defendant's guilt in committing a battery on Reverend Vinson, although clearly one defendant did shoot him. See *People v. Rothermel* (1982), 88 Ill. 2d 541, 544, 431 N.E.2d 378, 380; *People v. Handzik* (1951), 410 Ill. 295, 307, 102 N.E.2d 340, 346 ("As a general rule, it is elementary that the State is required to prove every essential averment of the charge against the defendant"), *cert. denied* (1952), 343 U.S. 927, 96 L. Ed. 1337, 72 S. Ct. 760; see also 1 J. Decker, Illinois Criminal Law § 9.17 (2d ed. 1993).

Although not cited by any party, we find *People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105, on point. In *Lopez*, the defendants, identical twin brothers, were convicted of attempted murder and aggravated battery arising from a shooting incident. They were with several people in a car when one of their companions got out of the car and threatened a group leaving a store across the street. A witness saw both defendants exit the car; one of them had a gun. He chased a man into a hallway and shot, wounding two men. His brother, meanwhile, remained across the street. There was no testimony identifying which twin fired his gun and which stayed near the car. However, it was clear that one of the brothers shot the victims. *Lopez*, 72 Ill. App. 3d at 716, 391 N.E.2d at 106-07.

We found that the defendants were not guilty under an accountability theory as urged by the State because there was no evidence that the defendant who stayed near the car had any knowledge that a crime was planned or that he "voluntarily attached" himself to the group with the knowledge that they were going to engage in illegal conduct. (*Lopez*, 72 Ill. App. 3d at 717, 391 N.E.2d at 108.) We accordingly reversed the judgments against both defendants because the State failed to prove which brother fired the gun. *Lopez*, 72 Ill. App. 3d at 717, 391 N.E.2d at 108.

Similarly, in the present case, accountability is inapplicable and, although one of the defendants shot Reverend Vinson, the State failed to show which one and, thus, failed to prove either guilty beyond a reasonable doubt of aggravated battery with a firearm. (See Ill. Rev. Stat. 1991, ch. 38, par. 12—3 (now 720 ILCS 5/12—3 (West 1992)); see *People v. Bowman* (1971), 132 Ill. App. 2d 744, 270 N.E.2d 285 (reversing the defendant's conviction of battery when the evidence indicated that he did not strike or make any contact at all with the victim and he could not be held accountable for his codefendant's conduct).) While the State may have proven defendants guilty beyond a reasonable doubt on another charge, such as aggravated assault (see Ill. Rev. Stat. 1991, ch. 38, par. 12—2(a)(13) (now 720 ILCS 5/12—2(a)(13) (West 1992))), it did not choose to pursue that theory of prosecution; nor are we empowered to find defendants guilty on a more appropriate charge. See *Fagan v. Washington* (7th Cir. 1991), 942 F.2d 1155, 1160 (commenting that "the [S]tate must live with the consequences of having proceeded on a theory that it could not establish with the certitude required in criminal cases").

The Illinois cases the State relies on to support its contention that the identity of the shooter is irrelevant are inapposite, because in each the State successfully utilized a theory of prosecution which rendered such proof unnecessary. *E.g.*, *People v. Stanciel* (1992), 153

Ill. 2d 218, 606 N.E.2d 1201; *People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898 (accountability); *People v. Allen* (1974), 56 Ill. 2d 536, 309 N.E.2d 544, *cert. denied* (1974), 419 U.S. 865, 42 L. Ed. 2d 102, 95 S. Ct. 120; *People v. Hickman* (1974), 59 Ill. 2d 89, 319 N.E.2d 511, *cert. denied* (1975), 421 U.S. 913, 43 L. Ed. 2d 779, 95 S. Ct. 1571 (felony murder).

The State urges us to consider *State v. Lilliston* (1906), 141 N.C. 857, 54 S.E. 427, contending that it presents a similar factual situation. In that case, the defendant became involved in a gunfight with another man after they argued. The two fought it out at a crowded railroad station and, as a result, one bystander was killed and another wounded. The reviewing court affirmed his murder conviction. However, in *Lilliston*, unlike the case at bar, there was evidence that the defendant's bullet killed the bystander. (*Lilliston*, 141 N.C. at 859-60, 54 S.E. at 428-29.) Thus, *Lilliston* does not provide support for the State's position.

Accordingly, after viewing the evidence in the light most favorable to the prosecution, we hold that the evidence was insufficient to convict defendants of aggravated battery with a firearm. Consequently, we reverse those convictions.[2]

■ The above discussion does not apply to the charge of aggravated discharge of a firearm. On that charge, the State needed to prove only that each defendant knowingly "[d]ischarge[d] a firearm in the direction of another person," Reverend Vinson. (See Ill. Rev. Stat. 1991, ch. 38, par. 24—1.2(a)(1) (now 720 ILCS 5/24—1.2(a)(1) (West 1992)).) The State was not required to prove that the defendants actually shot a person.

Each defendant next contends that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Each also reasons that because he was acting in self-defense, he could not be guilty of any offense relating to the injury sustained by Reverend Vinson. See *People v. Whitelow* (1987), 162 Ill. App. 3d 626, 631, 515 N.E.2d 1327, 1330, *appeal denied* (1988), 119 Ill. 2d 573, 522 N.E.2d 1254.

When a defendant presents some evidence of the elements of the affirmative defense of self-defense, the burden shifts to the State to

---

[2]The dissent on this issue finds *People v. Brackett* (1987), 117 Ill. 2d 170, 510 N.E.2d 877, applicable to the instant case. However, because in *Brackett* the trial court found that the defendant's conduct clearly led to the death of his victim and the evidence supported that conclusion, we find it inapposite. In the present case, we are faced with the situation where two defendants are undoubtedly guilty of criminal conduct, but there is insufficient evidence to support one of the charges against them.

prove beyond a reasonable doubt that issue as well as the other elements of the offense. (Ill. Rev. Stat. 1991, ch. 38, par. 3—2 (now 720 ILCS 5/3—2 (West 1992)); *People v. Luke* (1993), 253 Ill. App. 3d 136, 141, 625 N.E.2d 352, 356; *People v. McGrath* (1989), 193 Ill. App. 3d 12, 26, 549 N.E.2d 843, 852.) The elements of self-defense include: (1) that force was threatened against the defendant; (2) that the defendant was not the aggressor; (3) that the danger of harm or injury was imminent; (4) that the threatened force was unlawful; (5) that the defendant actually believed that (a) danger existed, (b) that force was needed to avoid the danger, (c) that the type and amount of force used were required; and (6) that the defendant's beliefs were reasonable. *People v. Harmon* (1990), 200 Ill. App. 3d 411, 413, 558 N.E.2d 173, 174.

If, in the view of the trier of fact, the State negates any of these elements beyond a reasonable doubt, it has carried its burden of disproving the defense. (*Harmon*, 200 Ill. App. 3d at 413, 558 N.E.2d at 174.) A reviewing court may not disturb the trier of fact's determination that the defendant was not acting in self-defense unless that conclusion is so unreasonable or improbable that a reasonable doubt of the defendant's guilt lingers. (See *People v. Felella* (1989), 131 Ill. 2d 525, 533-34, 546 N.E.2d 492, 495.) Furthermore, when the only evidence of self-defense is the defendant's testimony, the trier of fact has discretion to accord that testimony less weight because of its self-serving character. *Luke*, 253 Ill. App. 3d at 142, 625 N.E.2d at 357; see also *Harmon*, 200 Ill. App. 3d at 413-14, 558 N.E.2d at 174.

■ In Peterson's case, the evidence of self-defense consisted of his testimony that Castile had a reputation as a killer and as a dangerous and threatening person and that he had shot Peterson a year earlier. He also testified that he felt threatened when Castile asked him to pay on his debt and that Castile made movements toward his gun at that time. He claimed that he drew his gun because he was frightened.

However, on cross-examination, Peterson testified that he had known Castile for 9 or 10 years, that he approached him for the loan, and that he never reported the earlier shooting to the police. He further conceded that he did not go home after paying the money or contact police to report Castile's threatening behavior. Reverend Vinson indicated that he was shocked by the shooting because they had all been friends. He also testified that Peterson warned Castile to stay out of his territory as Castile was approaching the car wash. Furthermore, in his statement, Peterson indicated that he and Castile pulled their guns simultaneously.

The issue of self-defense thus rested on the credibility of the wit-

nesses, a determination for the trial judge. (*Banks*, 260 Ill. App. 3d at 469, 632 N.E.2d at 261.) Ample evidence supports the conclusion that Peterson was not in fear of imminent danger and that he and Castile were both aggressors. We accordingly find no error in the trial judge's determination that Peterson did not act in self-defense.

■·The judge's determination that Castile did not act in self-defense was equally well founded. Castile claims that when he told Peterson to get his "stuff," he was "making an offer to engage in combat at some future time when Mr. Peterson became armed." When Peterson suddenly turned around with his weapon drawn, Castile shot in response to a "deliberate sneak attack."

However, Reverend Vinson testified that in response to Peterson's warning to stay off of his territory, Castile, who was armed, stated that he would blow him away. Reverend Vinson was unsure who shot first. Additionally, Reverend Vinson and Officer DiCristofano corroborated Castile's statement that he chased Peterson through the car wash. Thus, even if Castile initially shot in self-defense, he lost the benefit of that defense when he became the aggressor by pursuing Peterson rather than retreating. (See *People v. Johnson* (1975), 33 Ill. App. 3d 957, 961, 338 N.E.2d 895, 899.) We consequently find no merit to Castile's claim that he acted in self-defense.

■ Defendants next argue that the aggravated discharge of a firearm statute is unconstitutional. Although they concede that we have addressed and rejected their arguments on this issue in *People v. James* (1993), 246 Ill. App. 3d 939, 617 N.E.2d 115, they now urge us to reject *James*.[3] However, since the analysis in that case was based on the clear language and purpose of the statute, we decline to reconsider our conclusion that the aggravated discharge of a firearm statute is constitutional. See *James*, 246 Ill. App. 3d 939, 617 N.E.2d 115; accord *People v. Tucker* (1994), 264 Ill. App. 3d 923, 637 N.E.2d 477.

Peterson argues that if we find the statute constitutional, the State failed to prove him guilty of that charge. He contends that even if he fired more than once, he aimed only at Castile and not in the direction of Reverend Vinson. The State counters that both

---

[3]Castile adopts this and several other arguments set forth in Peterson's brief. The State contends that by not arguing those issues in his brief, Castile has waived them. (134 Ill. 2d R. 341(e)(7).) However, supreme court rules do not expressly prohibit such a procedure which, in effect, presents the arguments of both parties without duplication. In any event, the rules on waiver do not in any way limit the jurisdiction of the reviewing court. *People v. Pecor* (1992), 153 Ill. 2d 109, 116, 606 N.E.2d 1127, 1131.

defendants were equally guilty of firing in the direction of Reverend Vinson if "either or both defendants fired shots in [his] direction."

As noted above, the defendant is guilty of aggravated discharge of a firearm if "he knowingly *** [d]ischarges a firearm in the direction of another person." (720 ILCS 5/24—1.2(a)(2) (West 1992); see also *People v. Hartfield* (1994), 266 Ill. App. 3d 607.) "Knowingly" is defined as a mental state in which one acts with knowledge of "[t]he result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct." 720 ILCS 5/4—5(b) (West 1992); see also 720 ILCS Ann. 5/4—3 Committee Comments—1961 (Smith-Hurd 1993).

Peterson finds support for his claim in *Hartfield*. In that case, the defendant drew his gun and ran into a gangway between two buildings. A police detective heard gunshots as he pursued the defendant but never saw the defendant fire his gun. We reversed the defendant's conviction of aggravated discharge of a firearm because there was no evidence that the defendant aimed his gun at the detective.

Unlike *Hartfield*, in the present case there was evidence that Peterson shot as he ran into the car wash knowing that Reverend Vinson was nearby. Peterson admitted in his statement that he and Castile were shooting outside of the car wash and as they ran through it. Reverend Vinson testified that Castile and Peterson were still shooting when they entered the car wash. Since Peterson had to turn around to enter the car wash and was still shooting as he did so, the trial judge's conclusion that he shot in the direction of Reverend Vinson was supported by the evidence. We therefore affirm Peterson's conviction of aggravated discharge of a firearm.

Finally, Castile argues that the denial of his motion for a severance made during Peterson's testimony was "damaging" and forced him to defend himself against Peterson, as well as the State.

Defendants who are jointly indicted are jointly tried unless one defendant will be prejudiced by, for example, antagonistic defenses. (*People v. Brown* (1989), 194 Ill. App. 3d 958, 963, 553 N.E.2d 712, 715-16, *appeal denied* (1990), 133 Ill. 2d 561, 561 N.E.2d 696.) Generally, a defendant must move for a severance prior to trial, demonstrating how he or she will be prejudiced in a joint trial; mere anticipation of prejudice is not sufficient to justify separate trials. (See *People v. Hall* (1987), 164 Ill. App. 3d 770, 781, 518 N.E.2d 275, 283, *appeal denied* (1988), 121 Ill. 2d 576, 526 N.E.2d 835, *cert. denied* (1988), 488 U.S. 867, 102 L. Ed. 2d 143, 109 S. Ct. 174.) The propriety of a trial judge's ruling on a motion to sever is reviewed under an abuse of discretion standard. (*People v. Appold* (1976), 39 Ill. App. 3d

814, 815, 350 N.E.2d 511, 512.) Moreover, in a bench trial, it is presumed that the judge can exclude from consideration any improper evidence. *Brown*, 194 Ill. App. 3d at 963, 553 N.E.2d at 716.

The State contends that Castile waived this issue by not requesting a severance prior to trial. However, when Castile's counsel moved for a severance, he indicated that he was surprised by Peterson's testimony. The trial judge considered the motion without objection by the State and we accordingly consider this claim of error.

■ On the merits of Castile's claim, he has not shown that reversal is required because he suffered no prejudice as a result of the trial court's denial of his motion. Peterson was effectively cross-examined by Castile's counsel, bringing his veracity into question. This is evident from the fact that the trial judge expressly rejected Peterson's self-defense claim. Consequently, there is no reason to abandon the presumption that the trial judge considered only proper evidence in assessing Castile's case. See *Brown*, 194 Ill. App. 3d at 963, 553 N.E.2d at 716.

Based upon the foregoing, we vacate defendants' aggravated battery of a senior citizen convictions and reverse their aggravated battery with a firearm convictions. We affirm their aggravated discharge of a firearm convictions and remand their cases to the trial court for resentencing.

Vacated in part; reversed in part; affirmed in part; and remanded.

JUSTICE DiVITO, concurring in part and dissenting in part:

I concur with the majority's vacatur of defendants' convictions for aggravated battery of a senior citizen under the one-act-one-crime rule; with its affirmance of defendants' convictions for aggravated discharge of a firearm; and with its holding that the aggravated discharge of a firearm statute is constitutional. I respectfully dissent, however, from its reversal of defendants' convictions for aggravated battery with a firearm and from its judgment remanding the cases to the circuit court for resentencing.

When two persons are illegally shooting at each other (committing the felony of aggravated discharge of a weapon) and one of them inadvertently shoots an innocent bystander, it is unacceptable that neither should be considered culpable because it cannot be determined whose bullet wounded the victim. Such a conclusion is inconsistent with the well-established principle that a "defendant is presumed to intend the natural and probable consequences of his acts." *People v. Terrell* (1989), 132 Ill. 2d 178, 204, 547 N.E.2d 145, 156, *cert. denied* (1990), 459 U.S. 959, 109 L. Ed. 2d 749, 110 S. Ct. 2567.

One natural and probable consequence of two people shooting at each other is that someone is going to get shot.

The majority states that it has found no case where, as here, defendants shooting at each other were held accountable for each other's conduct. Nonetheless, we should so hold in this case. One is accountable for the actions of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (720 ILCS 5/5—2(c) (West 1992).) The majority correctly states that "[t]he principal attribute of accountability is the showing of affirmative conduct by an accomplice that in some way aids, encourages or incites another to commit a crime." (273 Ill. App. 3d at 420.) Unlike the majority, however, I would hold that, when someone is shot, each of the participants in an illegal gunfight is guilty of aggravated battery with a firearm both by his own actions and by accountability for the actions of the other. There can be no gunfight without at least two participants, and each participant aids and abets the others in furtherance of a common criminal design.

Further, I would also hold the doctrine of transferred intent applicable to this case. Since I would hold each defendant culpable by reason of accountability for the actions of the other, it does not matter which of the defendants actually fired the bullet that struck Reverend Vinson. Whichever one did so is guilty of aggravated battery with a firearm based on the doctrine of transferred intent, and the other is guilty of aggravated battery with a firearm based on a combination of accountability for the actions of the other and the other's transferred intent.

I disagree with the majority that *People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105, is on point. We should not compare that case, where one of the defendants had to be not guilty, to this one, where each might be held responsible for the natural and probable consequences of his actions.

I understand that virtually all of the cases treating factual situations analogous to this one address the issue in terms of accountability or felony murder. Some of the language from the felony murder cases, however, supports the State's position here. In *Terrell*, for example, our supreme court held that the murder in that case was sustainable "under any or all three sections of the murder statute." (*Terrell*, 132 Ill. 2d at 204, 547 N.E.2d at 155.) In *People v. Rosochacki* (1969), 41 Ill. 2d 483, 244 N.E.2d 136, the supreme court approved jury instructions on all three versions of murder even though the defendant in that case was charged only with intentional murder. (See

also *People v. Allen* (1974), 56 Ill. 2d 536, 309 N.E.2d 544, *cert. denied* (1974), 419 U.S. 865, 42 L. Ed. 2d 102, 95 S. Ct. 120.) Given those cases, the State's argument here should not be dismissed simply by stating that the cases it cites are dependent on felony murder, as the majority does.

In *People v. Brackett* (1987), 117 Ill. 2d 170, 510 N.E.2d 877, an 85-year-old woman died as a result of choking on her food one month after she had been beaten and raped by the defendant. The defendant was held responsible for her death because her injuries precluded insertion of a nasal feeding tube and caused her to be unable to expel food lodged in her trachea. The supreme court discussed the natural consequences of the defendant's actions and the fact that the defendant was not relieved of responsibility for murder because he could not foresee the precise manner of the victim's death. In commenting on the issue of causation and the deference to be afforded the fact finder's conclusions, the court employed words that apply equally well here:

> "Causal relationship is a question of fact which should be left to the trier of fact [citation], and we will not disturb this verdict unless this evidence is so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to defendant's guilt [citation]." *Brackett*, 117 Ill. 2d at 177, 510 N.E.2d at 813.

I would affirm the judgments for aggravated battery with a firearm.

JUSTICE McCORMICK, concurring in part and dissenting in part:

The record before the court on this appeal supports none of the convictions under review. Therefore, I respectfully dissent from that portion of the majority opinion affirming defendants' convictions for aggravated discharge of a firearm.

The majority gives short shrift to defendant Castile's self-defense argument; however, an examination of our case law on self-defense indicates that he was acting in self-defense when he either returned defendant Peterson's gunfire or initiated the gun battle after Peterson pulled his gun on Castile. Even ignoring both defendants' statements, Reverend Vinson's testimony clearly established that Peterson drew a gun on Castile. That Castile may have said some fighting words prior to Peterson's act does not alter the fact that (1) unlawful force was threatened against Castile; (2) Castile was not the aggressor; (3) the danger of harm was imminent; (4) Castile believed that a danger existed and that the use of force was necessary; and (5) Castile's belief was reasonable. Thus, the State was required to

disprove at least one of these elements beyond a reasonable doubt. (*People v. Rodriguez* (1994), 258 Ill. App. 3d 579, 582, 631 N.E.2d 427.) It did not do so.

Indeed, the majority acknowledges that Castile was acting in self-defense when he began firing. Nonetheless, the majority insists that he became an aggressor because he chased Peterson through the car wash while firing his gun. I recognize that for a defendant to maintain a claim of self-defense, he may not become the aggressor after initially being the nonaggressor. (*People v. De Oca* (1992), 238 Ill. App. 3d 362, 606 N.E.2d 332.) However, when Castile ran into the car wash, any allegation that he was committing the offense of aggravated discharge of a firearm, as charged in the indictment against him, fails. The State charged Castile with "knowingly discharg[ing] a firearm in the direction of *Donald Vinson*." (Emphasis added.) The State did not charge Castile with firing his gun at Peterson, yet when he was running through the car wash, he was no longer firing in the direction of Reverend Vinson. Whether he was the aggressor or defender at this point is irrelevant because Castile was not indicted for firing at Peterson.

As to Peterson, the majority holds that the accountability and transferred intent doctrines do not apply in this case. I agree, but given this, the State plainly failed to carry its burden of proving that Peterson discharged his firearm in the direction of Reverend Vinson, as alleged in the indictment. The photographic evidence in the record establishes that Vinson was sitting in a chair in front of the wall next to the open garage-sized door of the car wash. Vinson testified that when Peterson opened fire, Peterson's back was to Vinson. Thus, the crime of firing a gun in Vinson's direction could not have been accomplished at this juncture. (*People v. Hartfield* (1994), 266 Ill. App. 3d 607, 608-09, 640 N.E.2d 39.) Acknowledging this, the majority concludes that when Castile and Peterson ran through the car wash, shots continuing to ring out, Peterson must have been firing in Vinson's direction, although nobody saw Peterson firing backwards as he ran through the car wash. When Peterson's gun was recovered minutes later, it contained only one spent shell. The evidence fairly shows that the bullet from that casing was fired at Castile and passed through his leg. *Hartfield* holds that a conviction for aggravated discharge of a firearm cannot stand under such circumstances, *e.g.*, where a witness hears gunshots, but does not see either from where they emanated or in what direction they were aimed. (*Hartfield*, 266 Ill. App. 3d at 609.) On the evidence presented, Peterson did not fire in Vinson's direction. Only Castile did so. Certainly, Peterson could have been charged with firing at Castile. Inexplicably, he was not. That error does not justify sustaining an unsupported conviction.