UNITED STATES of America ex rel. Theodore BELL # B–52015, Petitioner,

v.

Mark PIERSON, Respondent.

No. 99 C 6467.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 7, 2000.

David C. Thomas, Chicago–Kent College of Law, Chicago, IL, for Petitioner.

Margaret O'Connell, Assistant Attorney General, State of Illinois, Chicago, IL, for Respondent.

*MEMORANDUM ORDER*

SHADUR, Senior District Judge.

Theodore Bell ("Bell"), acting through pro bono publico counsel David Thomas, has filed a Verified Amended Petition for Writ of Habeas Corpus ("Petition") to overturn the state court convictions on which Bell is now serving a long-term sentence. In conformity with the procedure called for by the Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"), this Court

earlier determined that an evidentiary hearing was required to resolve the issues raised by the Petition. What follows are the findings of fact ("Findings") and conclusions of law ("Conclusions") stemming from the November 8, 2000 hearing ("Hearing").[1] To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

### Findings of Fact

1. Former Chicago Police Officer Bell was convicted in Circuit Court of Cook County Case No. 92 CR 4419 on charges of (a) first degree murder in the January 19, 1992 killing of Stanley Latham ("Latham") and (b) the aggravated discharge of a firearm arising from the same incident. Bell is now serving a 28–year term of imprisonment (Tr. 48) in the Illinois Department of Corrections' Hill Correctional Center in Robinson, Illinois, where respondent Mark Pierson is Warden.

2. Bell was convicted after a bench trial before the Honorable Joseph Urso (April 13, 1993 Tr. F54–F56[2]). Both before trial and during the trial of the charges referred to in Finding 1, Bell was represented by Roosevelt Thomas ("Thomas"), an attorney licensed to practice law in the State of Illinois (Tr. 72).[3]

3. Bell testified during the trial in support of his claim that he had fired shots at Latham only in self-defense. In that re-spect Bell's claim was that he reasonably feared death or great bodily harm because Latham was shooting at him with a gun (April 6, 1993 Tr. D123). Although Bell himself testified that Latham had a gun (April 7, 1993 Tr. E121), the eyewitnesses presented by the prosecution denied that (April 5, 1993 Tr. C16), and the other two eyewitnesses presented by Thomas on Bell's behalf—Lathanial Hood ("Hood") and Leon Watson ("Watson")—were not in a position to testify that Latham had a gun (*id.* E8, E52–E53). Hence Bell's testimony that Latham was armed and was shooting at him—vital to Bell's self-defense—was not corroborated by any other eyewitness testimony at trial (April 2, 1993 Tr. B52; April 5, 1993 Tr. C16).

4. In finding Bell guilty, Judge Urso specifically stated (April 13, 1993 Tr. F54–F56):

> The court is also convinced that the State has proven beyond a reasonable doubt that the defendant Theodore Bell did not act in self-defense in this case. I do not believe the evidence shows in anyway (sic) that the deceased was armed with a gun or any weapon at thee (sic) time of the shooting.

5. During the November 8 Hearing before this Court, Bell presented the testimony of Anthony Stevens ("Stevens"), whom this Court finds to have been a totally credible witness (more on the subject of his credibility later). In summary, Stevens' testimony—fully credited by this Court and unquestionably of a type that a reasonable factfinder (whether judge or jury) could credit at a retrial of Bell—was this:

---

1. All references to the Hearing transcript are simply cited ("Tr.—").

2. All citations to Bell's trial court proceedings will take the form exemplified in the text. In any event, there is no dispute about the na-ture of the trial record as described in these Findings.

3. Thomas is unrelated to Bell's present counsel, David Thomas.

(a) In the very early morning hours of January 19, 1992 Stevens (who is age 56 and a college graduate, Tr. 15) was in his car double-parked on the east side of Michigan Avenue in Chicago, facing northbound and approximately 40 feet to the southeast of the entrance to Chic Rick's Lounge at 2544 South Michigan (*id.* 17–18). Stevens was there waiting for a friend (*id.* 19).

(b) Stevens had been at home before driving to Chic Rick's. He had not had anything alcoholic to drink, nor had he used any drugs (*id.* 18–19).

(c) Although Stevens had known Bell casually at that time, it was only in the context of what he described as a "friendly neighbor type situation" (*id.* 16). Stevens is neither related to Bell (*id.*) nor has he ever socialized with Bell (*id.* 17), and he is not a close friend of Bell's in any fashion (*id.*).

(d) While Stevens was parked waiting for his friend, he heard shots, with the sound coming from the southwest, to his left (*id.* 19). Stevens heard several shots, estimated at six to eight (*id.* 20). There were different sounds to the shots, as coming from two different guns (*id.* 22).

(e) When Stevens turned in the direction of the sounds he saw two men, whom he now knows to be Latham and Bell (*id.* 24). Each man had his right arm extended, holding a gun pointing at the other man and in a firing posture (*id.* 20–22). Stevens had a clear and unobstructed view of the two men, and the area was well lit by artificial lighting from street lights (*id.* 21).

(f) Only a few seconds (perhaps 10 or so, *id.* 22) after witnessing the two men shooting at each other, Stevens decided he "didn't want to be there" (*id.* 23),[4]

and he proceeded to drive northbound on Michigan Avenue to make his way home (*id.*).

(g) Later that day Stevens saw a television news account of the incident (*id.* 24). That news account identified Bell (Stevens' brief view of the event had not enabled him to identify the individuals he had seen) and said that Latham was sitting in his car when Bell went up and emptied his gun by shooting Latham while the latter was in the car (*id.* 26). That account was totally inconsistent with what Stevens had personally observed.

(h) Because Stevens now knew who one of the persons involved had been, and because the news account had been flatly inconsistent with what Stevens had seen, either that day or the next day (January 20, 1992) Stevens went to the home of Bell's mother Beverly Williams ("Williams"). When Stevens told Williams what he had seen, she told him that she would pass his name and the information on to Bell's lawyer (*id.* 24–26).

(i) Although Williams did just that (see Finding 8), Thomas never communicated with Stevens. If he had done so, so that Stevens could then have been subpoenaed to testify at Bell's criminal trial, Stevens would have testified to the same facts as stated in this Finding 5 (*id.* 26–27). Stevens did not attend Bell's trial because he didn't know if or when it had taken place.

6. Respondent Pierson's counsel sought, totally without success, to create a doubt as to Stevens' testimony and his credibility. In that respect she attempted to impeach Stevens with a 1996 affidavit that had been prepared for Stevens' signa-

---

**4.** Respondent Pierson's counsel objected to any question as to why Stevens said that (*id.*). But nothing in that entirely understandable reaction—wanting to leave the scene of an ongoing shooting in which he had no involvement—casts any cloud on Stevens' credibility.

ture (and that he had signed) in connection with one of Bell's post-conviction efforts—an affidavit that named Bell and Latham as the persons Stevens had seen shooting, while Stevens testified at the Hearing (truthfully, this Court finds) that he had not recognized the men at the time of the incident (Tr. 27) and had learned of their identity only later that day, through the news telecast (*id.* 28). It is frankly frivolous for counsel to urge that by way of impeachment—clearly the affidavit simply conveyed that Stevens was able to state the men's identities *at the time that the affidavit was prepared and signed.* As this Court observed when counsel advanced that contention, there is nothing to suggest that there was more than one gun battle at Chic Rick's that night (Tr. 32)[5]-so any argument that Stevens is not to be believed because the affidavit was purportedly at odds with his testimony during the Hearing does not even rise to the level of frivolousness.

7. In February or March 1992 Bell's mother Williams retained Thomas to represent Bell. Williams was acting on Bell's behalf because he was retained in custody following his arrest until about May 11, 1992 (*id.* 41). Under the oral agreement between Williams and Thomas, the latter agreed to represent Bell on three matters, including the murder trial, for a $25,000 fee (*id.* 84). But Williams paid Thomas only a $1,000 retainer fee, and Thomas did not receive any other money before the murder trial began (*id.* 85, 89–90).

8. During Bell's first conversation with Thomas, he told Thomas that his mother had the names of some potential witnesses, including someone who could testify that Latham had a gun at the time of the shooting (*id.* 76–77). Within a couple of weeks after Williams had retained Thomas, she gave him a written list containing the names, addresses and telephone numbers of such witnesses (*id.* 43–44, 74, 93).[6] Williams gave Thomas the list in the fourth floor hallway outside Judge Urso's courtroom at the Criminal Courts Building at 26th and California in Chicago (*id.* 44). Most importantly, one of the names on the list was Anthony Stevens.

9. Thomas attempted to reach Stevens in only one way: by attempting to telephone him several times. But on every occasion there was no answer and there was no answering machine (*id.*). Yet despite the critical need for corroborative eyewitness testimony to support Bell's claim of self-defense, Thomas made no further attempt to communicate with Stevens. Thus he failed to make any effort to obtain Stevens' address through his known telephone number or through further contact with Williams or in any other way—and consequently Thomas never sent a letter to Stevens, nor did he get Stevens' address

---

**5.** This Court's later review of the exhibits originally submitted by respondent Pierson in connection with the answer to the Petition reflects that Chic Rick's "bouncer" confirmed at trial—unsurprisingly—that the Bell–Latham confrontation had been the only incident involving gunfire that morning.

**6.** Williams, who is terminally ill with lung cancer (she reportedly had 30 to 45 days to live at the time of the Hearing, Tr. 35) and was physically unable to be brought to court on the day of the Hearing (as had been planned) because she had just been taken to the hospital to have her lungs drained (Tr. 5–6) and was then taken home (Tr. 35), testified under oath via speakerphone pursuant to stipulation (Tr. 40). Williams' testimony was entirely lucid and totally credible. As to the subject just covered in the text, Thomas recalled being given two names, one man and one woman, while Williams thought there were six or seven. That disparity is not significant, because it is clear (and this Court finds) that the vital eyewitness Stevens was one of the names that Williams gave to Thomas.

so that he could visit there and leave his business card (*id.* 87).

10. Because Thomas had received only $1,000 on account of his fee, on March 16, 1993 (only 16 days before the scheduled April 2 beginning of the murder trial) Thomas moved before Judge Urso to withdraw from the case because of the nonpayment (*id.* 51–52, 87–89). But after conferring with Bell and his mother Williams in the hall and receiving a promise to get some additional money, Thomas withdrew his motion and told Judge Urso that he would be ready for trial on April 2 (*id.* 52, 89–90). As it turned out later, none of the promised money was paid (*id.* 90).

11. At Bell's insistence a meeting was held on March 27, 1993 among ·Thomas, Bell, Hood and Watson (*id.* 53, 57, 78). Although the purpose of the meeting was for Thomas to prepare Bell and his witnesses to testify at trial, all that Thomas did as to Hood and Watson was to give them copies of their grand jury testimony and to say that "they were bound by that testimony" (*id.* 78). During the Hearing Thomas testified, "I don't know what else more that I could do in terms of preparing them as witnesses" (Tr. 78–79), even though he conceded that he knew beforehand that "their grand jury testimony didn't cover everything they ended up testifying to" (*id.* 91). Despite that knowledge, Thomas did not put Hood and Watson through any sort of question and answer preparation (*id.* 53–54, 58). As for Bell himself, who had not testified before the grand jury, Thomas did not put him through any question and answer preparation either (*id.* 53–54). Surprisingly, during the Hearing Thomas as-

signed as the reason for his not having done so that he did not want Bell to testify (*id.* 91), even though he acknowledged that the sole defense offered was going to be self-defense, which by definition involved Bell's state of mind (*id.* 92). Moreover, Thomas admitted that Bell wanted to testify, and he agreed that it is a defendant's ultimate decision whether to testify or not (*id.* 91).[7]

12. In terms of his other preparation (or lack of preparation), Thomas never hired, or asked the court to appoint, an investigator to locate witnesses (*id.* 87). Instead Thomas' attempts to investigate the case were limited to talking to Chic Rick's "bouncer" and others whom Thomas happened to encounter there (*id.* 80–81). Nor did Thomas ever visit the scene with Bell and his witnesses (*id.* 88).

13. On April 7, 1993, after the criminal trial had already begun and on the date that Bell was to present his defense, a breakfast meeting was held in the second floor cafeteria at 26th and California (*id.* 44, 54, 58–59), including Thomas, Bell and Williams (*id.* 44, 55). Both Bell and Williams expressed concern that Thomas was not planning to call witnesses other than Hood and Watson on Bell's behalf, specifically mentioning Anthony Stevens (*id.* 45–46, 59–60). Yet inexplicably Thomas responded that no additional witnesses were needed (*id.* 44, 54–55, 58–59).

14. During the trial itself Thomas committed a number of errors of greater or lesser levels of seriousness, whose significance was not alone of constitutional dimension but whose cumulative effect add-

7. As with the following Findings 12 through 14 that identify Thomas' numerous deficiencies in his handling of the defense, what has been said in this Finding 11 does not go directly to the issue of Bell's "actual innocence" and hence his entitlement to habeas relief, which (as the Conclusions will explain)

hinge on Thomas' total failure to have located and presented Stevens as an eyewitness corroborator of Bell's self-defense contention. But the entire congeries of Thomas' inadequacies bear, as an evidentiary matter, upon his insufficient level of representation.

ed significantly to the impact of the fatal flaw regarding the absence of eyewitness Stevens' testimony. Here are several instances of Thomas' other significant errors in his representation of Bell:

(a) Thomas failed to elicit testimony from medical examiner Dr. Donaghue that Latham was shot in the chest. That testimony would have served to corroborate Bell's testimony that Latham was facing Bell when Latham was shot, not fleeing or sitting in his car as the prosecution maintained (April 5, 1993 Tr. C77–C79).

(b) Thomas failed to argue that the testimony by Dr. Donaghue that the trajectory of two of three bullets which struck Latham was horizontal directly impeached the prosecution's theory that Latham was sitting in his car and Bell was standing at the time the shots were fired, for in that event the trajectory of each of the bullets would have been downward (April 5, 1993 Tr. C77–C79).

(c) Thomas further failed to counter the prosecution's theory that Latham was sitting in his car when he was shot by eliciting testimony from the forensic witnesses that Bell's gun was a police-issued .357 Magnum that used police-issued hollow tip bullets, and yet the window through which Latham was supposedly shot was not shattered as it would have been from such firepower. That evidence would further have corroborated Bell's testimony that Latham was standing outside his car when he was shot (*id.* C39–C152).

(d) Thomas failed to argue that the 9mm shells found at the scene, which were concededly not from Bell's weapon, were never dusted for Latham's fingerprints (April 6, 1993 Tr. D37–D44).

(e) Thomas failed to cross-examine and argue that the passenger in the car, Nicole Boyd ("Boyd"), was not searched by the police at the scene, so that they did not explore the possibility that La-

tham could have passed her a gun with which he was armed (April 2, 1993 Tr. B100–B104).

(f) Thomas failed to use the toxicology report that Latham's blood alcohol level was .135 milligrams per deciliter as impeachment of the testimony presented by the prosecution from Latham's friends, who claimed that Latham (who stood 6'1" and weighed 240 pounds) had consumed only "a few beers" before his confrontation with Bell (April 5, 1993 Tr. C78).

(g) Thomas failed to argue the issue of transferred intent—the concept that Bell's intent was solely to defend himself from Latham, so that any shots fired in the direction of passenger Boyd were fired with the intent of exercising Bell's right of self-defense against Latham (April 6, 1993 Tr. D123).

15. Most critically, as the foregoing Findings and the ensuing Conclusions confirm, Bell's ability to demonstrate to the trier of fact that a reasonable doubt existed as to whether he had acted in self-defense would have established his actual innocence of the charged crime of murder—a prerequisite to his ability to obtain habeas relief here. And the prejudice that Bell suffered in that respect from Thomas' failure to have obtained and presented Stevens' strongly corroborative evidence is demonstrated not only by Judge Urso's statement quoted in Finding 4 but also by Thomas' own candid concession during the Hearing that if Bell had indeed presented a witness at the criminal trial who thus corroborated Bell's own testimony that Latham had a gun at the time of the shooting, it "would have been a very, very valuable addition" to Bell's case (Tr. 101), and it "[w]ould have made all the difference in the world" in the outcome (*id.*).

*Conclusions*

1. This Court has jurisdiction over this matter under Section 2254, which provides in relevant part that a writ of habeas corpus shall issue if a person is "in state custody in violation of the Constitution . . . of the United States."

2. What the Findings have set out as to new evidence and arguments not presented at trial—most powerfully Stevens' corroborative testimony—establish more than sufficient doubt about Bell's guilt to compel the conclusion that it would be a miscarriage of justice to allow his conviction to stand unless it was the product of a fair trial including those matters (see *Schlup v. Delo,* 513 U.S. 298, 316, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). With Bell having supported his claim with "new reliable evidence" (indeed, vital evidence) and arguments that were not presented at trial (*id.* at 324, 115 S.Ct. 851), "it is more likely than not that no reasonable [finder of fact] would have convicted him in the light of the new evidence" (*id.* at 327, 115 S.Ct. 851). That conclusion takes into account the obligation of the prosecution to prove beyond a reasonable doubt that Bell did *not* act in self-defense (720 ILCS 5/3–2(b); and see, e.g., *People v. Peterson,* 273 Ill.App.3d 412, 423–24, 210 Ill.Dec. 276, 652 N.E.2d 1252, 1261 (1st Dist.1995)[8] and *People v. Evans,* 259 Ill.App.3d 195, 216, 197 Ill.Dec. 278, 631 N.E.2d 281, 295 (1st Dist.1994)[9]). As the defendant in such a criminal prosecution, Bell does *not* bear the burden of proving that he was acting in self-defense.

3. Because this Court is convinced that the new evidence and arguments raise sufficient doubt about Bell's guilt to undermine confidence in the outcome of the trial without an assurance that his trial was untainted by constitutional error, *Schlup,* 513 U.S. at 317, 115 S.Ct. 851 teaches that Bell's threshold showing of his actual innocence justifies a review of the merits of his constitutional claim of ineffective assistance of counsel. And because that showing goes to the issues of Bell's actual innocence of the crime charged, this Court may grant the writ even in the absence of a showing of cause for Bell's asserted procedural default (*id.* at 321, 115 S.Ct. 851, quoting *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).

4. That then calls for consideration of the merits of Bell's ineffective assistance of counsel claim. And in that respect the seminal decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) sets the standards. Conclusions 5 and 6 express the *Strickland* analysis in terms of its twofold requirements.

5. As for *Strickland*'s first prong, this Court concludes that Bell has amply demonstrated that trial counsel Thomas rendered a constitutionally deficient level of performance. As the Findings have confirmed, attorney Thomas failed totally to fulfill his duty to make a reasonable investigation, or to make a reasonable decision not to investigate, as to vital (really essential) witness Anthony Stevens (*Strickland,* 466 U.S. at 691, 104 S.Ct.

---

**8.** *Peterson* (like this case) was a bench trial involving a shooting (though fortunately it did not prove fatal). On appeal, after reconfirming the principle stated in the text, the Appellate Court upheld the trial judge's rejection of a self-defense argument. Just so, Judge Urso's resolution of the issue could not be faulted on the evidence before him—but with the strongly corroborative testimony by eye-witness Stevens added to the evidentiary mix, the *Schlup* standard is readily met.

**9.** *Evans* was a jury trial for first degree murder. After an exhaustive review of the trial testimony, the Appellate Court found that the State had not sustained its burden in the face of a self-defense argument and overturned the conviction.

2052). Thomas also failed to subject the prosecution's case to meaningful adversarial testing by failing to cross-examine and to present the other evidence and arguments detailed in Findings 11 through 14 (*id.* at 688, 104 S.Ct. 2052).

6. As for the second prong of the *Strickland* test, this Court concludes that there is more than a reasonable probability that but for counsel Thomas' inadequate performance the outcome would have been different (*id.* at 694, 104 S.Ct. 2052)—that such probability is more than sufficient to undermine confidence in that outcome (*id.*). It is certainly reasonably probable (at a minimum) that the testimony of Anthony Stevens alone, as Thomas himself conceded on cross-examination, "[w]ould have made all the difference in the world." When the other errors and omissions of attorney Thomas are added to that involving Stevens, the totality is more than sufficient to undermine confidence in the outcome of Bell's trial and to render the result unreliable (*id.* at 694, 104 S.Ct. 2052). To phrase the matter a bit differently, there is more than a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt as to Bell's guilt (*id.* at 695, 104 S.Ct. 2052).

\*     \*     \*     \*     \*     \*

In accordance with Section 2254, this Court orders that Bell's Petition for a Writ of Habeas Corpus is granted. It is further ordered that unless the State of Illinois retries Bell within 120 days from the date of this order on the charges on which he was convicted, it shall release him from custody.