In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4296

United States of America,
ex rel. Theodore Bell,

Petitioner-Appellee,

v.

Mark A. Pierson, Warden,
Hill Correctional Center,

Respondent-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 6467--Milton I. Shadur, Judge.

Argued March 27, 2001--Decided September 10, 2001

Before Bauer, Posner, and Manion, Circuit
Judges.

Manion, Circuit Judge.  Petitioner
Theodore Bell, a former police officer,
was convicted in Illinois state court of
first-degree murder and aggravated
discharge of a firearm. He appealed his
conviction to the Illinois Appellate
Court, which affirmed. He then filed a
petition for leave to appeal with the
Illinois Supreme Court, which was denied.
Bell also filed a pro se petition for
post-conviction relief in the Circuit
Court. This too was denied, and the
Circuit Court's decision was affirmed on
appeal. The Illinois Supreme Court denied
Bell's petition for leave to file an
appeal on his petition for post-
conviction relief. Bell then filed
apetition for writ of habeas corpus in
federal district court. After an
evidentiary hearing, the petition was
granted. Respondent Mark Pierson, Warden
of the Hill Correctional Center, appeals.
We reverse.

I.

On January 19, 1992, Stanley Latham died
of multiple gunshot wounds. It is
undisputed that Bell did the shooting.
But the facts leading up to Latham's

death are hotly contested. Because a comparison of the trial evidence and the habeas evidence presented to the district court is crucial to this appeal, we set forth that evidence in some detail.

At trial, Bell testified that he left the Chic Rick's bar on Michigan Avenue in Chicago around 4:30 to 5:00 a.m. and stopped to talk to friends. He witnessed a fight between Latham and another individual, Lethaniel Hood, and intervened. Latham hit Bell, who fell to the ground. Upon standing up, Bell testified that he saw Latham putting his hand in his pocket and he claims that he thought Latham was reaching for a gun. He therefore drew his gun and pointed it at Latham. The bar's security guard told Bell to be calm, and Bell saw that Latham had not drawn a gun. Bell then put his gun away. Because the crowd was frightened, Bell ran off to put his gun inside a car. Then, while running, Bell heard two gunshots, turned around, and saw Latham standing at the door of Latham's car, apparently with a gun pointed at Bell. Bell fired six times at Latham, who then drove off. According to Bell, he only shot at Latham out of fear for his life.

Kerry Fortenberry, Demetrius Harper, and Nicole Boyd, all of whom went out that night with Latham, tell a different story. According to Fortenberry, the bar was closing at 4:30 a.m. and the four of them departed. Latham and Fortenberry went to get their cars, which they parked near the bar; Boyd got into Latham's car and Harper got into Fortenberry's car. When Boyd went to Fortenberry's car toretrieve her coat, Latham walked back to the bar. Fortenberry testified that shortly thereafter, Harper saw someone in a tan coat fall near the entrance to the bar (apparently Bell), and Fortenberry then saw Latham running to his car, chased by three others. Fortenberry testified that he was parked in front of Latham and saw Bell shoot Latham as he attempted to drive away from his parking space. Fortenberry further testified that Bell was an arm's length from Latham when he shot into the driver's side window, that he fired three shots before Latham had left the parking space, and that he continued to shoot at the car after it had left. Fortenberry did not see a gun in Latham's car and had not seen Latham

use a gun that evening.

Demetrius Harper, seated in Fortenberry's car, testified that she looked out the rear window and saw an individual in a tan trench coat fall. This individual got up and ran toward their cars while holding a gun. Latham ran to his car and got into it. Harper then saw the man in the trench coat attempt to open the door to Latham's car, and stated that this individual began shooting when he was unsuccessful at opening the door. She also testified that she heard three shots before Latham pulled away, and that she heard two more shots and saw Latham's rear window shatter after he had driven off. Harper identified Bell as the individual in the tan coat from a lineup the following morning. She also testified that she had not seen Latham with a gun.

Nicole Boyd testified that after she returned with her coat, she got into Latham's car. Minutes later, Latham jumped into the car and tried to pull away. He was unable to do so immediately because a car was parked in front of his car. An individual with a gun came up to the driver's side window. Although Boyd could not see his face, he was wearing a beige trench coat. Boyd heard gunshots, felt the car move, and then heard three additional shots. The car swerved and she told Latham to stop. Latham responded that he could not because he had been shot and asked her to help. Boyd stepped on the brake and turned off the ignition. She identified Bell's gun in court as the one used by the shooter.

Another individual, Edward Jackson, was also at Chic Rick's with friends that night. He exited the bar and saw Latham fighting three men. Latham was hit, and when he turned around, punched Bell, who had just walked out of the bar and was wearing a beige trench coat. Bell fell to the ground and when he got up he drew a gun. Bell then aimed the gun at Latham who threw up his hands, which were empty. A security guard walked out and told Bell to calm down. As this happened, Latham backed away and then started running. Bell broke free from the guard and ran after Latham with the gun in his hand. Jackson then went to meet his friends by their car. He heard five or six shots but did not see the shooting.

Mark McClom, the bar security guard, testified that he went outside the bar to break up an argument between Latham, Bell, and two of Bell's friends. As he returned to the bar, he noticed the men exchange punches. McClom saw Latham hit Bell, who fell. Bell pulled a gun, and McClom lowered Bell's arm. Bell then aimed his gun at Latham, and Latham put his hands up. At this point, McClom grabbed Bell's arm again. Latham ran away, and seconds later Bell ran in the same direction. McClom testified that he never saw a gun in Latham's hands, and he did not see the actual shooting.

Leon Watson was with Bell and Lethaniel Hood at the bar that evening. He testified for the defense that he was walking toward a pay telephone when he heard a commotion. Watson saw Latham punch Bell, who fell. Latham then ran off. Watson went towards his car with Hood, and Bell was ahead of him. Watson testified that he saw Latham leaning into Latham's car door "because I saw the car door open" and heard a man say "he has a gun." He then heard gunfire and ducked behind a car, but he did not see who was firing the gun. He heard seven or eight more shots, and when he peered around the corner of the car he saw Bell walking to wards them.

Lethaniel Hood testified that he was standing outside the bar with Bell and Watson when Latham started a fight with Hood. Hood testified that Latham threatened to "bust a cap and 'f' me up." Bell got involved, and Latham made the same threat to Bell. Latham hit Bell in the nose, and hit him again in the mouth, at which point Bell fell down. At one point, Hood fell, and when he got up Latham was running across the sidewalk towards the street. Hood, Bell, and Watson were all behind him. Hood testified that he heard someone "say he had a gun" which Hood assumed meant Latham. Hood started backing up, heard a couple of gunshots, and "got down." He heard seven or eight gunshots in total. Hood stated that he didn't really see what had happened; when Latham got to his car Latham stooped down in the car, then stood up, after which Hood heard the shots.

Richard Bednarek, a Chicago police

officer, was parked a block away when the shooting occurred. Bednarek testified that when he approached Latham's car after the shooting, he saw that the rear and driver's side rear door windows were shattered, and the driver's side window was "spiderwebbed" with cracks. Bednarek also testified that Latham had nothing in his hands, and a vehicle search produced no weapons. When Bednarek realized that Latham was "in a lifeless state," he and another officer removed Latham from the car. At that time, Bednarek did not observe or feel a weapon on Latham's body. Although Latham was taken to the hospital, he died that morning.

Chicago police officer Raynor Ricks and his partner, John Butler, searched Latham's car, and they also found no weapons. Ricks testified that both door windows on the driver's side of the car as well as the rear window were broken. There were bullet holes in the driver's side and left passenger's rear doors, and there was also a bullet hole in the roof and in the deck between the rear window and back seat. Shell casings from a gun different from Bell's were apparently found on the scene.

Sergeant Steven Sherwin testified that when Bell came into the police station after the shooting, Bell told him the man he shot pulled a gun first and fired several shots. According to Sherwin, Bell said he then drew his gun and shot back. It was stipulated that Sherwin would testify that Bell turned over a .357 caliber six-shot revolver after theshooting.

Doctor Edmond Donoghue performed an autopsy on Latham. Donoghue testified that there was an entrance wound on the left side of Latham's back, 19.2 inches beneath the top of the head and 4.7 inches to the left of the midline. There was another entrance wound on the left side of the chest, 21.7 inches beneath the top of the head, in the mid-axillary line (which Donoghue testified is an imaginary vertical line drawn through the center of the armpit). There was also an entrance wound on the left lateral chest, more to the front of the body, in the interior axillary line (an imaginary line from the front of the armpit). This was an atypical gunshot wound, which Donoghue testified is "caused when a bullet strikes the body in other than its nose-

on trajectory, and one of the most common reasons . . . is that the bullet had struck an intermediate target before entering the body." There was an additional entrance wound in the back of the left arm which passed all the way through the arm. Donoghue testified that this bullet may have caused the atypical wound in Latham's chest. Finally, Donoghue found evidence of an old, prior gunshot wound in Latham's back.

Bell was charged with two counts of first-degree murder and two counts of aggravated discharge of a firearm. He pleaded not guilty and waived his right to a jury trial. On April 13, 1993, Judge Joseph Urso found Bell guilty beyond a reasonable doubt of first-degree murder and aggravated discharge of a firearm. The trial court also found that Bell did not act in self-defense. Bell received concurrent sentences of 28 years for the murder charge and 15 years for the aggravated discharge of a firearm. Bell appealed to the Illinois Appellate Court, claiming that the evidence was insufficient to establish guilt beyond a reasonable doubt and that his sentence was excessive. The Illinois Appellate Court affirmed his conviction and sentence. The Illinois Supreme Court denied his petition for leave to appeal. Bell filed a pro se petition for post-conviction relief, alleging ineffective assistance of counsel, an excessive sentence, and violation of his Sixth Amendment right to confront witnesses. The petition was dismissed, and Bell appealed the dismissal to the Illinois Appellate Court. The Illinois Appellate Court affirmed, and Bell filed a petition for leave to appeal with the Illinois Supreme Court. The petition was denied on October 28, 1998.

On October 1, 1999, Bell filed a petition for writ of habeas corpus in federal district court. On December 22, 1999, Bell filed an amended petition, claiming he was denied the effective assistance of counsel because: 1) counsel failed to conduct a reasonable pre-trial investigation; 2) counsel failed to subject the prosecution's case to meaningful adversarial testing; and 3) counsel failed to adequately present a defense.

The district court held an evidentiary

hearing, and found that Bell's mother had given Bell's attorney the name of an eyewitness, Anthony Stevens, who would testify that Bell and Latham were both shooting at each other. Stevens had not been drinking or using any drugs on the night of the shooting, and although Stevens knew Bell casually as a neighbor, they were not close friends.

Stevens testified before the district court that he was double-parked about 40 feet southeast of the entrance to Chic Rick's. While waiting for a friend in his car, Stevens heard shots to his left, behind his car. According to Stevens, there were six to eight shots, and the shots made different sounds, as if they came from two guns. When he turned toward the direction of the shots, he saw two men, each with his right arm extended and pointing a gun at the other man in a firing posture. A few seconds later Stevens decided that he "didn't want to be there," and drove home.

Stevens testified that he subsequently saw a television report on the incident, and the account identified Bell. Because the news account described Bell as shooting Latham while he was sitting in his car (while Stevens had seen both men shooting at each other), he went to Bell's mother and gave her his name and address.

Stevens had not testified at trial. The district court determined that Bell's attorney had failed to get in contact with Stevens, and that the attorney made insufficient efforts to find Stevens. The district court also held that the newevidence provided by Stevens was credible, and that it would result in a fundamental miscarriage of justice if Bell's conviction were to stand unless it were the product of a fair trial including this new evidence. Accordingly, the district court considered the merits of Bell's ineffective assistance of counsel claim under Strickland v. Washington, 466 U.S. 668 (1984), and concluded on that basis that the writ of habeas corpus should be granted. The government appeals.

II.

Bell's petition for habeas review was filed on October 1, 1999, and it

therefore is reviewed pursuant to the regulations of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997). The AEDPA amended the habeas requirements under 28 U.S.C. sec. 2254, and authorizes issuance of the writ only if the petitioner has exhausted all available state remedies. See Rodriguez v. Scillia, 193 F.3d 913, 916 (7th Cir. 1999). We review the district court's legal holdings de novo, and its factual findings for clear error. See Foster v. Schomig, 223 F.3d 626, 634 n.4 (7th Cir. 2000).

As noted, Bell claims he was denied the effective assistance of counsel because: 1) counsel failed to conduct a reasonable pre-trial investigation; 2) counsel failed to subject the prosecution's case to meaningful adversarial testing; and 3) counsel failed to adequately present a defense. Respondent argued before the district court that Bell's claims were procedurally defaulted. Generally, federal courts may only review a procedurally defaulted claim "if the petition shows cause for failure to raise [the defaulted claim] at the appropriate time and actual prejudice which resulted from such failure." See Rodriguez, 193 F.3d at 917 (citing Wainwright v. Sykes, 433 U.S. 72, 91 (1977)). This rule is grounded in concerns of comity and federalism. See Coleman v. Thompson, 501 U.S. 722, 731 (1991). Absent such a showing, the defaulted claim is reviewable only where a refusal to consider it would result in a fundamental miscarriage of justice. See Rodriguez, 193 F.3d at 917.

In this case, the district court did not decide whether any of Bell's claims were procedurally defaulted, nor did it address whether cause and prejudice were shown (presumably because Bell never attempted to show cause and prejudice). The district court bypassed these questions, instead resting its entire holding on the grounds that a fundamental miscarriage of justice would result if Bell's claims were not considered, based on Stevens' testimony. Accordingly, before proceeding to the question of procedural default, we first review the district court's decision.

Respondent claims the district court

erred in concluding that a fundamental miscarriage of justice would result if it did not consider Bell's Strickland argument. The controlling case in this context is the Supreme Court's decision in Schlup v. Delo, 513 U.S. 298 (1995). Under Schlup, in order for a case to fall under the "narrow class of cases" which implicates a fundamental miscarriage of justice, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup, 513 U.S. at 315, 327. This means the petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in light of . . . new evidence." Id. at 327 (quotation omitted). Only then can the petitioner's constitutional claims be considered.

As the Schlup Court explained, the petitioner's claim of actual innocence is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claimconsidered on the merits.'" Id. at 315 (quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)). Accordingly, without new evidence of innocence, even a meritorious constitutional claim is not sufficient to allow a habeas court to reach the merits of a procedurally defaulted claim. See id. at 316.

The determination of whether a petitioner established a probability that no reasonable juror would have convicted him in light of new evidence is a mixed question of law and fact. See O'Dell v. Netherland, 95 F.3d 1214, 1249 (4th Cir. 1996) (en banc), aff'd on other grounds, 521 U.S. 151 (1997). Unlike the legal question of whether no reasonable juror could have convicted the defendant, see, e.g., Jackson v. Virginia, 443 U.S. 307 (1979), Schlup requires an analysis of whether no reasonable juror would have convicted, and Schlup requires the district court to consider the credibility of the petitioner's new evidence. Accordingly, a district court applying Schlup must make factual findings. However, "the district court is in no better position than an appellate court to then add that new evidence to the evidence that was presented at trial or to speculate as to the likelihood that a reasonable juror would convict based on

the sum of all the evidence." O'Dell at 1250. Thus, as a mixed question of law and fact, the Schlup probability determination that no reasonable juror would convict is reviewed de novo. See id.; Ellsworth v. Levenhagen, 248 F.3d 634, 638 (7th Cir. 2001) (mixed questions of law and fact are reviewed de novo).

The district court, in concluding that Bell's new evidence created a probability that no juror would convict, stated that its decision "takes into account the obligation of the prosecution to prove beyond a reasonable doubt that Bell did not act in self-defense." See United States ex rel. Bell v. Pierson, 2000 WL 1810235, *6 (N.D.Ill. 2000) (emphasis in original). In Illinois, to establish self-defense the defendant must provide evidence that: 1) force had been threatened against the defendant; 2) the defendant was not the aggressor; 3) the danger of harm was imminent; 4) the force threatened was unlawful; 5) the defendant actually believed that the danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary; and 6) the defendant's beliefs were reasonable. See People v. Morgan, 719 N.E.2d 681, 700 (Ill. 1999). The state may then defeat the claim by proving beyond a reasonable doubt that one of the elements of self-defense is not met. See People v. Peterson, 652 N.E.2d 1252, 1261 (Ill. App. Ct. 1995).

Applying this Illinois law, however, does not show a probability that "no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt." See id. Indeed, the standard for finding a funda mental miscarriage of justice assures that the petitioner's case must be "extraordinary," and requires "a stronger showing than that needed to establish prejudice" under Strickland./1 See Schlup, 513 U.S. at 327 n.45. This case is not the extraordinary one.

Stevens' testimony, no matter how credible (and we defer to the district court's finding that it was "totally credible"), suffers from a fatal deficiency. His testimony offers a momentary window onto a course of events, a perspective that is both too late and

too early to adequately counter the overwhelming evidence that Bell did not act in self-defense, when reviewed under the standard set forth in Schlup. Stevens did not see the events leading up to the shootout he describes, and he did not see the events afterward./2

Significantly, the district court found Stevens' testimony credible on the issue of whether Latham was armed. Bell notes that the trial court, in finding him guilty, emphasized that there was no evidence to support his claim that Latham had a gun. This statement must be compared with the full text of the trial court's credibility findings, which stated:

The court is convinced that the State has proven the defendant guilty beyond a reasonable doubt. The court is also convinced that the State has proven beyond a reasonable doubt that the defendant Theodore Bell did not act in self-defense in this case. I do not believe that the evidence shows in anyway [sic] that the deceased was armed with a gun or any weapon at thee [sic] time of the shooting. I also believe that the evidence shows that Mr. Bell did not act in any unreasonable belief that the defendant was in fact armed. The court believes that this in fact occurred very closely as the prosecution witnesses attested to.

R.20-3, F-55. As the record shows, and the trial court's findings indicate, Latham's unarmed status was one ground for rejecting the self-defense argument. But it was not the only ground presented by the evidence. It is crucial that the state court found the prosecution witnesses credible generally.

Stevens' habeas testimony may conflict with the testimony of those witnesses who did not see Latham with a gun, but it does not address the initiation of the shooting, and it does not conflict with the abundant testimony and evidence (evidence which, except for Bell's own statements, is uncontroverted) that at some point Bell chased the victim and shot him at close range as he sat in his car.

There was ample evidence that Bell was the aggressor, pulling his gun first and,

according to almost every witness (including Bell's friends), chasing after Latham when he ran away. And there was ample evidence that Bell shot Latham while Latham was seated in his car, when he no longer posed a threat. Fortenberry, Harper, and Boyd all testified that Bell shot Latham at close range in his car as Latham attempted to leave his parking space and drive off. This testimony was found credible by the trial court, and it is supported by the evidence of Latham's gunshot wounds and the broken car windows.

The district court's probability finding, accordingly, must be reversed. It is not probable on this record that no reasonable juror would have found Bell guilty beyond a reasonable doubt if it found based on Stevens' testimony that Latham was armed, or at one point even shooting back./3 Since credible prosecution witnesses testified that Bell chased Latham and shot him while Latham was seated in his car, and Stevens adds nothing new on this subject, there is a likelihood that a reasonable jury would reject the self-defense argument. Credible new testimony disagreeing with credible testimony by the prosecution witnesses on one point--Latham's possession or use of a gun--does not create a probability that no reasonable juror would accept the prosecution witnesses' testimony regarding subsequent events. Bell has not shown a probability that no juror would find beyond a reasonable doubt that Bell met the final elements of self-defense under Illinois law--i.e., that Bell held a reasonable belief that lethal force was necessary to avert imminent danger from Latham. Therefore, Bell has not shown a probability that no juror would convict in light of the new evidence. Accordingly, because Bell's petition does not meet the extraordinary circumstances necessary for there to be a "fundamental miscarriage of justice," we may not reach his constitutional claims if they weredefaulted.

Because the district court never decided whether habeas relief would be available if Bell had not met the high standard for a fundamental miscarriage of justice, our holding above does not yet resolve this case. The government contends that the district court's opinion impliedly held

that all of petitioner's claims of ineffective assistance of counsel were procedurally defaulted because the court proceeded under the fundamental miscarriage of justice standard. However, on December 22, 1999, the district court issued an order which stated that "it would seem that the only claims that do not face rejection on procedural default grounds are those included in Petition para.para.II.A.1 and II.C.1."/4 Then, on August 9, 2000, the district court issued an order requiring an evidentiary hearing which noted that "Bell's claim of self-defense, if established, would equate to his actual innocence under Illinois law, thus bypassing issues of procedural default." Finally, the district court's opinion itself only referred to the procedural default as "asserted." These statements all suggest the court, given its finding of a fundamental miscarriage of justice, believed a determination of whether a procedural default occurred was unnecessary, and not that the court impliedly ruled against Bell on the question of procedural default.

On appeal, the issue of whether Bell procedurally defaulted his claims was not briefed by the parties. But the parties briefed the issue before the district court, which then indicated in its order of December 22, 1999 that the majority of Bell's claims appeared to have been defaulted. A review of the record indicates that the district court's impression was correct./5

As noted previously, a procedural default bars federal habeas review unless there is a showing of cause and prejudice or a fundamental miscarriage of justice would result. In this case, the exhaustion doctrine is fatal to most of Bell's claims. "[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). The petitioner must "fairly present" the federal issue to the state courts as a precondition to exhaustion. See Verdin v. O'Leary, 972 F.2d 1467, 1472-73 (7th Cir. 1992).

Bell never argued any theory of ineffective assistance of counsel on direct appeal in state court, and his

state court petition for post-conviction relief, as well as his post-conviction appeals, only raised ineffectiveness claims based on failure to investigate and present alibi witnesses. Accordingly, as his new claims, listed above in footnote five, are independent of the claims he raised in state court, they are defaulted. As we have noted before, "[i]t is not sufficient that [the petitioner] alleged various other errors by counsel; to set forth a claim of ineffective assistance, a petitioner 'must identify the specific acts or omissions of counsel that form the basis for his claim of ineffective assistance.'" Momient-El v. DeTella, 118 F.3d 535, 541 (7th Cir. 1997). The state courts were never given an opportunity to consider most of Bell's claims of ineffectiveness of counsel, either on direct appeal or in state post-conviction proceedings. Procedural default accordingly bars habeas review of his new claims./6

  The situation is different respecting Bell's claim of ineffectiveness based on his failure to present Anthony Stevens' testimony. This claim of ineffective assistance was clearly presented in state court. The government argued in district court that this claim was defaulted based on independent and adequate state grounds, however. We disagree.

  "We will not review a question of federal law decided by a state court if that decision rests on state law grounds that are independent of the federal question and adequate to support the judgment." Franklin v. Gilmore, 188 F.3d 877, 881 (7th Cir. 1999). In order for the state court decision to be independent, the court must have "actually . . . relied on the procedural bar as an independent basis for itsdisposition of the case." Harris v. Reed, 489 U.S. 255, 261, 62 (1989) (quoting Caldwell v. Mississippi, 472 U.S. 320, 327 (1985)). "Whether a ground is independent depends on state law . . . therefore, in order for the state judgment to bar federal habeas review, the last state court to render a judgment in the case must have 'clearly and expressly state[d] that its judgment rests on a state procedural bar.'" Thomas v. McCaughtry, 201 F.3d 995, 1000 (7th Cir. 2000) (citation omitted) (quoting Jenkins v. Nelson, 157 F.3d 485, 491 (7th

Cir. 1998)). In addition, "[s]tate court decisions are not adequate to bar federal habeas review unless they rest upon firmly established and regularly followed state practice." Franklin, 188 F.3d at 882 (citing James v. Kentucky, 466 U.S. 341, 348-51 (1984)).

Here, in post-conviction proceedings, the Illinois appellate court's decision did expressly reference res judicata and waiver, the procedural bar at issue. However, the court did not explicitly apply this Illinois procedural bar to the facts of Bell's petition. Rather, it proceeded to discuss whether Stevens' claim that Latham was armed could merit relief. The court concluded that Bell failed to show sufficient evidence to succeed under Strickland, and affirmed the state trial court's order denying an evidentiary hearing and post-conviction relief. The court concluded with the general statement, "For these reasons the order of the circuit court of Cook County is affirmed."

There is no relevant distinction between these facts and the facts in Harris. In that case, the Supreme Court addressed an appellate court decision which referred to a state procedural bar (waiver) and then "went on to consider and reject petitioner's ineffective-assistance claim on its merits." Harris, 489 U.S. at 258. The Court explained that the state court must make a plain statement that it relies on an independent and adequate state ground, and concluded that the appellate court's decision "falls short of an explicit reliance on a state-law ground." See id. at 266. Accordingly, the Harris Court determined that habeas review was not barred. We reach the same conclusion here.

Since the claim of ineffective assistance based on counsel's failure to contact Stevens and present his testimony was not procedurally defaulted, it may be reviewed under the AEDPA.

The relevant portion of the AEDPA provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits

in State court proceedings unless the adjudication of the claim-- . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; . . . .

28 U.S.C. sec. 2254(d)(1).

   As the Supreme Court has explained, a state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application" of clearly established Supreme Court precedent when "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," or "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

   If the case falls under the "contrary to" clause of sec. 2254(d)(1), then we review the state court decision de novo to decide what is clearly established law as determined by the Supreme Court and whether the state court decision was "contrary to" that Supreme Court precedent. See Denny v. Gudmanson, 252 F.3d 896, 900 (7th Cir. 2001). If, on the other hand, the case falls under the "unreasonable application" clause, then we defer to a reasonable state court decision. See id. Moreover, state court factual findings that are reasonably based on the record are presumed correct. See 28 U.S.C. sec. 2254(e)(1); Gudmanson, 252 F.3d at 900.

   Where a state court has denied a Strickland claim on the merits, under the AEDPA we generally review for clear error. As we noted in Holman v Gilmore,

"Strickland calls for inquiry into degrees; it is a balancing rather than a bright-line approach . . . . This means that only a clear error in applying Strickland's standard would support a writ of habeas corpus." 126 F.3d 876, 881-82 (7th Cir. 1997). This is because "Strickland builds in an element of deference to counsel's choices in conducting the litigation [and] sec. 2254(d)(1) adds a layer of respect for a state court's application of the legal standard." Id.

In support of his petition for post-conviction relief, Bell presented an affidavit from Anthony Stevens testifying that he "saw Stanley Latham holding a gun in his hand at the time of the shooting between Stanley Latham and Theodore Bell." He also presented an affidavit from his ex-girlfriend, Lillian Winfrey, who claimed to have a friend named "Sharon" who told her that Latham had pulled a gun on Bell./7 The trial court dismissed the claim of ineffective assistance as frivolous and denied an evidentiary hearing. On appeal from the denial of post-conviction relief, the Illinois appellate court applied the second prong of the Strickland test and affirmed. The appellate court summarized the compelling evidence of guilt, then concluded, "[t]he affidavits, even if taken as true, do not refute the fact that after the alleged altercation was terminated by a security guard and the victim was attempting to flee the area, defendant broke free from the guard, pursued the victim with gun drawn and shot him at close range." Accordingly, the court concluded that the outcome of the trial would not have been different even if the proposed witnesses had testified.

The Illinois appellate court's reasoning respecting Stevens' affidavit, which applies equally to Stevens' habeas testimony, is not clearly erroneous. Even if Latham shot at Bell at some point in the altercation, Latham could not still be considered a danger with his hands on the steering wheel as he tried to drive away. Flight is not generally confused with aggression.

Applying the appropriate deference to the state court's application of Strickland, we conclude that it was not

unreasonable to find that the outcome would be the same even if the affidavits from Bell's alibi witnesses had been presented at trial. Under Strickland, there must be a reasonable probability that, but for the attorney's error, the result of the proceeding would have been different. The government presented several witnesses--credible ones according to the trial court--all of whom saw Bell shoot Latham as he sat in his car, attempting to drive away. Indeed, themedical evidence demonstrated that Latham had been shot in the back, and the broken windows on the car further supported the testimony that Latham was shot at as he tried to escape. The "spiderweb" bullet holes in the driver's side window would indicate the window was rolled up, so Latham couldn't be shooting out the window as he drove. The shattered rear window would indicate Bell was still shooting as the car left the scene. It was not unreasonable for the state courts to determine that the outcome would remain unchanged based on this uncontradicted (except by Bell's own testimony) evidence that Bell shot Latham in cold blood when he no longer posed a threat. It was certainly not clear error.

III.

In sum, the petitioner did not meet his burden of showing the requisite probability that no reasonable juror would convict under Schlup v. Delo. In light of the credible evidence of guilt before the Illinois trial court, the district court's finding of a fundamental miscarriage of justice was erroneous. As a result, the majority of Bell's habeas claims cannot be reviewed, since they were procedurally defaulted. In addition, the state courts' application of Supreme Court precedent to Bell's remaining claims was not unreasonable. Therefore we REVERSE the district court, and direct it to enter an order denying the habeas petition.

FOOTNOTES

/1 Under Strickland, the petitioner must show that his attorney's performance fell below an objective standard of reasonableness, and that his attorney's performance actually prejudiced him. See Strickland, 466 U.S. at 687. The test for prejudice requires the petitioner to show that there is a reasonable probability that, but for

the attorney's error, the result of the proceeding would have been different. See id. at 694.

/2 The district court also noted that Bell's original counsel stated that evidence that Latham was armed "would have made all the difference in the world." See Bell, 2000 WL 1810235 at *5. The district court did not appear to place significant weight on this testimony, however, and it is not apparent how this subjective and general opinion could carry much weight in light of the evidence before the trial court and the trial court's findings.

/3 Bell claims that the district court also identified seven additional items of "new" evidence to support its holding. The district court, however, expressly stated that its findings in this regard did not support a determination of "actual innocence." We agree. This evidence was used to support the district court's Strickland analysis. As the district court explained, "[d]uring the trial itself Thomas committed a number of errors of greater or lesser levels of seriousness, whose significance was not alone of constitutional dimension but whose cumulative effect added significantly to the impact of the fatal flaw regarding the absence of eyewitness Stevens' testimony." See Bell, 2000 WL 1810235 at *5. The allegedly new evidence of failure by Bell's counsel to properly cross-examine witnesses or make all of the available legal arguments does not qualify as new evidence of "actual innocence" sufficient for Bell to have his constitutional claim considered in the context of a procedural default.

/4 The claims which the district court order suggested were not procedurally defaulted were claims of ineffective assistance based on: failure to conduct adequate trial preparation and investigation by not contacting alibi witnesses; and failure to present an adequate defense by not calling those alibi witnesses. Anthony Stevens was one such witness.

/5 Bell never presented the majority of his habeas claims to the state courts. It is clear he never argued ineffective assistance of counsel based on: counsel's failure to properly prepare witnesses before their testimony; failure to cross-examine and argue that Nicole Boyd, the passenger in Latham's car, was not searched by the police at the scene; failure to argue that the 9 mm shells found at the scene were never dusted for Latham's fingerprints; failure to use the toxicology report which showed Latham's blood alcohol level; failure to impeach the prosecution's theory that Latham was sitting in his car when he was shot by eliciting testimony that would indi-

cate that the bullets Bell used should have shattered the car window; failure to elicit testimony from Dr. Donoghue that Latham was shot in the chest; failure to elicit testimony from Bell that he did not know there was a passenger in Latham's car; failure to argue that any shots fired in the direction of Nicole Boyd, Latham's passenger, were fired with the intent of self-defense against Latham; failure to argue that the results of paraffin tests showed both Bell's and Latham's hands were not positive for gunpowder residue; failure to argue for second-degree murder because Latham struck Bell twice prior to the shooting; failure to argue for second-degree murder based on the theory that even if the judge found Bell's belief that Latham had a gun and was shooting it at him was unreasonable, this would still reduce the level of the crime; failure to elicit testimony from Bell and other witnesses that someone yelled "He's got a gun," referring to Latham; and failure to argue that Dr. Donoghue's testimony that the trajectory of two of the bullets which struck Latham was horizontal, which would impeach the theory that Latham was seated in his car when he was shot, while Bell was standing.

/6 As the district court noted, Bell made no effort to argue cause and prejudice in order to avoid this procedural bar. His entire argument was that the procedural default could be bypassed based on Schlup. As a result, a cause and prejudice argument was waived. See Weber v. Murphy, 15 F.3d 691, 695 (7th Cir. 1993), cert. denied, 511 U.S. 1097 (1994).

/7 Bell's federal habeas petition presents a third affidavit, from Greg Reed. This individual allegedly would have testified to Latham's affiliation with the Gangsta Disciples and his propensity towards violence. Although this affidavit was never presented in state court, we need not decide whether a claim based on Reed's testimony was defaulted, since his affidavit would not alter our analysis below.